**TELOCATOR NETWORK OF AMERICA, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

No. 78–2218.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1981.

Decided Oct. 5, 1982.

Kenneth E. Hardman, Washington, D.C., with whom Richard B. Severy, Washington, D.C., was on the brief for petitioner.

Michael D. Sullivan, Counsel, Washington, D. C., with whom Margorie S. Reed, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Eliot J. Greenwald, Counsel, F. C. C., Barry Grossman and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., also entered an appearance for respondent, F. C. C.

Before ROBINSON, Chief Judge, ROBB, Senior Circuit Judge, and GINSBURG, Circuit Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

In recent years, the Federal Communications Commission, facing a burgeoning demand for a variety of specialized communications services, increasingly has perceived the public interest to warrant infusion of new carriers into the Nation's communications markets. Commission action lowering regulatory barriers to competitive entry has won judicial sanction in the fields of microwave [1] and domestic satellite [2] transmission, international dataphone operations,[3] telegraph and telex service,[4] paging,[5] and ex-

1. See *American Tel. & Tel. Co. v. FCC*, 176 U.S.App.D.C. 288, 539 F.2d 767 (1976) (review of order granting particular application); *Washington Util. & Transp. Comm'n v. FCC*, 513 F.2d 1142 (9th Cir.), *cert. denied sub nom. National Ass'n of Regulatory Util. Comm'rs v. FCC*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) (review of rulemaking).

2. See *Network Project v. FCC*, 167 U.S.App. D.C. 220, 511 F.2d 786 (1975). See also *United States v. FCC*, 209 U.S.App.D.C. 79, 652 F.2d 72 (1980) (*en banc*).

3. See *Western Union Int'l v. FCC*, 218 U.S.App. D.C. 148, 673 F.2d 539 (1982).

4. See *Western Union Tel. Co. v. FCC*, 214 U.S. App.D.C. 308, 665 F.2d 1126 (1981); *Western Union Tel. Co. v. FCC*, 214 U.S.App.D.C. 294, 665 F.2d 1112 (1981).

5. *Pocket Phone Broadcast Serv. v. FCC*, 176 U.S.App.D.C. 99, 538 F.2d 447 (1976).

perimental and mobile communications.[6] The rulemaking proceeding now before us ushers in the Commission's analogous policy in the area of mobile telephone operations, and a significant innovation in the technical methodology of these operations. With but one small though not unimportant caveat, we sustain the Commission's action.

## I

Land mobile radio communication involves the use of radio signals to send messages between stationary transmitting points—land, or base, stations—and motile receiving units carried on the person or in vehicles—mobile stations.[7] Encompassed within the broad family of land mobile services are systems incorporating varying degrees of technical sophistication, from the simple paging unit, which is capable merely of receiving an audible tone or voice message; through dispatch systems, such as those used by taxicabs and police cruisers, which permit the mobile station to transmit messages to the base station when the latter is not itself transmitting; to mobile telephone service, which enables the mobile unit to receive and transmit simultaneously, just as an ordinary telephone.[8] The Commission regulates these operations in the Domestic Public Land Mobile Radio Service.[9] Involved in this petition for review are mobile telephone operations which comprise but a small segment of that Service. Mobile telephone communication is offered to the public [10] on a common carriage basis by two distinct types of carriers: local telephone companies, which generally have been subsidiaries of American Telephone and Telegraph Company (AT&T), and independent radio common carriers (RCCs), which are not affiliated with telephone companies.[11] The petitioner, Telocator Network of America, is a trade association of RCCs.[12]

The rulemaking activities underlying this litigation began over 15 years ago. Sensing that land mobile services had outgrown the amount of radio spectrum allocated to them, the Commission inaugurated an inquiry into the feasibility of designating for those services portions of the spectrum then assigned to ultra-high frequency (UHF) television broadcasting.[13] The Commission decided to proceed in two phases. One docket, No. 18262, was initiated to provide long-term growing space for land mobile services.[14] That proceeding eventuated in reallocation of UHF channels 70 to 83 to the

6. *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 173 U.S.App.D.C. 413, 525 F.2d 630, *cert. denied sub nom. National Ass'n of Radiotelephone Sys. v. FCC,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

7. See 47 U.S.C. § 153(*1*)–(n) (1976); 47 C.F.R. § 22.2 (1981).

8. The mobile telephone's capacity for simultaneous reception and transmission is termed "full duplex." The need for a duplexer in such systems is one of the factors that renders them technically more complex than either paging or dispatch operations.

9. See generally 47 C.F.R. §§ 22.500–22.523 (1981).

10. The Commission has set priorities for satisfying the requests of those seeking mobile telephone service. Persons and entities with special needs, such as public health and safety organizations, press associations, and handicapped persons, must be accommodated before members of the general public are served. See *id.* § 22.512.

11. The instant petition for review does not directly involve frequency-allocation or other rules governing telephone companies providing mobile telephone service. The presence of those companies in this field is relevant here only because the petitioner asserts that RCCs face strong competition not only from each other but more especially from the well-established AT&T network. We have heretofore recognized this competitive circumstance in the mobile telephone service market. See *National Ass'n of Regulatory Util. Comm'rs v. FCC, supra* note 6, 173 U.S.App.D.C. at 419–420, 525 F.2d at 637–638.

12. Prior to September, 1977, Telocator was known as the National Association of Radiotelephone Systems. For simplicity's sake, we use its current name throughout.

13. See *Notice of Proposed Rulemaking for Docket No. 18261,* 14 F.C.C.2d 297 (1968).

14. *Notice of Inquiry and Notice of Proposed Rulemaking for Docket No. 18262,* 14 F.C.C.2d 311 (1968).

services, a resolution ultimately affirmed by this court.[15] A second docket, No. 18261, was opened to afford immediate, short-term relief by reassigning UHF channels 14 to 20 in ten major urban areas to land mobile services.[16] Ironically, it is the Commission's final order implementing this ostensibly stopgap measure that is challenged here.

In its First Report and Order in Docket No. 18261, the Commission found a severe public need for additional service in land mobile communications as a whole.[17] It announced its resolve to pursue a dual approach in meeting this need: first, immediate allocation of additional spectrum space [18] and, second, long-range implementation of technological advances and spectral assignment techniques that would enhance the efficiency with which the available spectrum could be utilized.[19] Up to this point in the proceeding, the Commission's primary focus had been on the land mobile communication demands of public health and safety organizations and certain industrial users. At the request of Telocator, however, the Commission agreed to add RCCs to the groups benefiting from frequency reassignment.[20]

Further rulemaking then followed to determine precisely how the newly-available spectrum should be allocated among the various land mobile services.[21] With respect to the RCCs, the Commission's notice proposed "to follow the pertinent rules and procedures currently used in authorizing common carrier land mobile radio systems." [22] The Commission also made known its "intent to limit the use of the frequencies to those licensees currently authorized to serve the areas involved." [23] Typifying the minor role the RCCs thus far had played in the Commission's planning, these proposals were unelaborated by discussion. More particularly, the notice contained no explanation of why the Commission thought it might be appropriate to limit access to the new frequencies to those already providing radio common carrier service.

In its ensuing Second Report and Order, the Commission specifically identified a need for additional RCC service in the metropolitan areas involved, and announced its intention to allocate portions of two UHF channels, representing a total of 24 mobile radio channels, to the RCCs.[24] For the first time, the Commission addressed in detail the question of who ought to be permitted to apply for the reallocated frequencies. It noted that Telocator strongly supported its proposal to disqualify new carriers from consideration for these channels by arguing that an entry barrier was necessary to enable existing RCCs to compete effectively with each other and with telephone companies offering mobile telephone service.[25] The Commission also observed that at least one commentator had opposed such restric-

---

**15.** *National Ass'n of Regulatory Util. Comm'rs v. FCC, supra* note 6.

**16.** *Notice of Proposed Rulemaking for Docket No. 18261, supra* note 13. Eventually, three other cities were added to the affected group, making a total of 13 metropolitan areas. See 47 C.F.R. § 22.501(k) (1981).

**17.** *First Report and Order for Docket No. 18261,* 23 F.C.C.2d 325, ¶¶ 4, 9–12 at 327, 329–330 (1970).

**18.** *E.g., id.* ¶¶ 28–30 at 337–338.

**19.** *Id.* ¶¶ 13, 16, 28 at 330–331, 332, 337–338.

**20.** *Id.* ¶ 65 at 349.

**21.** *Notice of Further Proposed Rulemaking for Docket No. 18261,* 27 F.C.C.2d 371 (1971).

**22.** *Id.* ¶ 16 at 377.

**23.** *Id.*

**24.** *Second Report and Order for Docket No. 18261,* 30 F.C.C.2d 221, ¶ 28 at 233 (1971). Because the voice transmission involved in land mobile communications requires less spectrum than does the transmission of television audio-visual signals, each former UHF channel could be divided into more than 100 channels for land mobile communication. The 24 channels we discuss actually are channel pairs—one carries the signal from the base station to a mobile unit; its complement accommodates transmission in the reverse direction. Throughout this opinion we, like the parties, will refer to the channel pairs simply as a channel.

**25.** *Id.* ¶ 30 at 234.

tion on grounds that the public interest would not be served by excluding new carriers.[26] The Commission responded to these competing positions at some length:

> While we are generally of the view that the preservation of opportunity for additional entry into a market is an important objective of public policy, we also feel that reasonable restrictions to the entry of additional licensees in certain markets might become necessary in order to prevent injury to the public interest by ruinous competition among a multitude of marginally viable carriers. We are persuaded, however, that additional entry by qualified applicants should be permitted on these frequencies in this service because the record in this proceeding does not support the conclusion that ruinous competition would result from open entry at this time. Allowing open entry does not foreclose the Commission from considering on a case by case basis in the future whether the public interest would be adversely affected by such a policy. The fact that we are more than doubling the number of available frequencies also supports the conclusion that it would be inappropriate to limit the new frequencies to existing licensees.[27]

Telocator promptly and vigorously opposed the Commission's decision to permit all qualified applicants to seek authorization to operate on the new frequencies. Moving for partial reconsideration and stay of the Second Report and Order, Telocator argued that a policy of restricted eligibility would speed assignment of the new frequencies, promote more efficient use of the spectrum,[28] and enable existing RCCs to compete more effectively with their fellows and with the telephone companies.[29] It also complained that the Commission had failed to identify any positive value to be served by additional competition in the form of new entry. The Commission responded by granting a stay pending action on the petition for reconsideration and by inviting comments on what had become known as the "open entry" issue.[30]

For some unexplained and perhaps inexplicable reason, proceedings in this docket then ground to a halt. After three years, Telocator, understandably dismayed that the promised stopgap relief still was unimplemented, withdrew its petition for reconsideration. Two more years passed, however, before the Commission again spoke on the subject. In January, 1977, the Commission proposed an entirely different and, at least in the area of mobile telephone service, unprecedented method of allocating the 24 new channels among the RCCs.[31] Until that time, the Commission had been assigning mobile telephone channels to applicants on a unitary, exclusive-use basis. On making a satisfactory showing of public need for the service, an applicant would be licensed to operate on one channel dedicated to his sole use;[32] when that channel was filled to capacity with mobile units, the applicant would return to the Commission and attempt to justify assignment to him of an additional channel.[33] What the Commission now proposed was assignment of the 24

**26.** *Id.*

**27.** *Id.*

**28.** This argument turned on the spectral efficiencies to be gained by "trunking," a concept explained *infra* at note 36. A trunked system requires contemporaneous access to several channels. Telocator pointed out that division of the new frequencies among existing RCCs would give each carrier additional channels with which to create a trunked system.

**29.** Telocator's petition for reconsideration was not included in the joint appendix filed in this court. Telocator's arguments against allowing new carriers to apply for the reallocated frequencies are, however, summarized in the

*Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, 63* F.C.C.2d 126, ¶¶ 4–5 at 127–128 (1977).

**30.** *Memorandum Opinion and Order for Docket No. 18261,* 31 F.C.C.2d 48 (1971).

**31.** See *Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, supra* note 29, 63 F.C.C.2d ¶¶ 17–24 at 132–134.

**32.** See generally 47 C.F.R. § 21.100(a) (1981).

**33.** See generally *id.* § 22.516.

new channels in two 12-channel blocks, each of which would be shared by multiple RCCs.[34] In essence, the Commission contemplated "convert[ing] the radio spectrum into a common right-of-way like a highway, so that competing RCCs would operate just like competing trucking firms in the provision of the services."[35]

The Commission's rationale for this novel proposal was two-fold. First, it believed that shared usage, when accomplished through the necessary technical coordination, promised markedly increased efficiency in spectrum utilization.[36] Second, it anticipated that an arrangement whereby multiple RCCs shared the same frequencies would avoid the problem of mutually exclusive applications, thereby averting the need for numerous and lengthy comparative hearings before the new allocations could be implemented.[37]

On the technical aspects of its proposal, the Commission explained that its new approach was based in part on its "successful experience" with a shared-frequency program in the "guardband" paging service and in part on "advances in technology."[38] It set out certain "minimum technical standards" necessary to permit concurrent operation of multiple systems without unacceptable interference, and opined that "[a]s proposed, we see no conceivable type of system that cannot be employed...."[39] Specifically, the Commission enumerated three possible methods of technical coordination. One, apparently deemed the easiest, involved all RCCs in a metropolitan area operating a common system.[40] The other two methods, which assume continuation of multiple independent facilities, centered on technical mechanisms for putting the separate systems in communication with one another in order to permit a base station wishing to place a call to determine which channels were occupied at that point in time. One such mechanism, a physical interconnection of all terminals by means of wirelines, was recognized as effective but potentially expensive if the facilities were widely separated.[41] The other, proposed by the Commission as an "economical" method, involved electronic "off-the-air monitoring" of each base station's transmission frequen-

**34.** *Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, supra* note 29, 63 F.C.C.2d ¶¶ 17–24 at 132–134.

**35.** Brief for Petitioner at 18.

**36.** *Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, supra* note 29, 63 F.C.C.2d ¶¶ 17–19 at 132. See also *id.* at ¶¶ 9–12 at 130. Increased efficiency in spectrum utilization is gained through the process of "trunking," that is, giving a single transmitting station simultaneous access to multiple channels so that it can systematically scan all lines until it finds an open channel on which to place a waiting call. This pooling enables expeditious handling of many more calls than is possible if each call had to be completed, if at all, only through one preassigned channel. Commission counsel explains the concept by use of a familiar analogy:

One way to consider the advantages of trunking is to think of the lines at a bank. If there is a separate line for each teller, the customer gets on what he thinks is a short line only to find out that the customer in front of him has a lengthy transaction. On the other hand, if there was only one line feeding into all the tellers, the line would keep moving because only one teller out of many would be slowed down by the lengthy transaction.

Brief of Respondent at 8 n.16. All parties agree that trunking is a far more efficient method of providing mobile telephone service, and that access to multiple channels is the *sine qua non* of a trunked system. Where Telocator and the Commission part company, however, is on the issue of whether the channels available for trunking should be assigned on an exclusive-use basis to one or a limited number of carriers, or shared by all in one massive trunked network.

**37.** *Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, supra* note 29, 63 F.C.C.2d ¶¶ 18, 24 at 132, 134.

**38.** *Id.* ¶ 19 at 132.

**39.** *Id.* ¶ 20 at 133.

**40.** *Id.* ¶ 24 at 133–134. Operation of a common system apparently can take the form of either one terminal directing all installations or several terminals of the same type coordinated centrally.

**41.** *Id.*

cies to identify those channels in use.[42] Stating that it had "considered in detail the technical design of such over the air monitoring systems," the Commission professed its conviction that this method would work.[43] In summary of the technical aspects of its proposal, the Commission acknowledged that "there may be merits to a completely standardized system," but opted instead "to allow the forces of the marketplace to determine what system each carrier may choose and what degree of standardization, if any, would result between systems other than that we've specified."[44]

In explaining the perceived merits of its new plan with respect to eliminating the problems of mutually-exclusive applications, the Commission reaffirmed its commitment to a policy of open entry.[45] It felt that Telocator's concern that acceptance of applications from new carriers would prolong the comparative decisionmaking process was obviated by its determination to depart from the old unitary, exclusive-use channel assignment procedure.[46] Addressing the contention that the RCCs could not economically withstand an influx of competitors, the Commission observed that it had "not been persuaded that 'open entry' will endanger the financial viability of existing RCCs."[47] It stated that its examination of 1976 "Form L" financial data submitted by RCCs in the pertinent markets had led it to conclude that

> ... however the case may have been in 1971, most RCCs today seem to be profitable. There has been consistent growth in recent years, so that we believe the RCCs are financially viable and can bear

any strain resulting from open entry. This is especially true, we think, in the major markets involved in this proceeding.[48]

Finally, the Commission's January 1977 proposal announced what has been dubbed the "perpetual open entry" policy. Reasoning that it had already determined that the public interest required additional mobile telephone service, the Commission proclaimed that applicants for the new frequencies would not have to make a separate "need" showing as part of their license requests.[49] The Commission further ordained that there would be no cutoff date for accepting new applications. It explained:

> Cut-off dates have been established in the past so that mutually exclusive applications could be processed and disposed of in an orderly manner, without new applications prolonging and confusing the matter. However, under our new proposal, there will not be any electically mutually exclusive applications, and so there is no need for a cut-off date.[50]

Thus, the Commission's new approach meant that "even after some licensees are in operation, new applications for use of the 12-channel blocks will still be accepted and granted, if the applicant shows that he is qualified, the proposal is technically feasible, and that there is still room available on the frequencies."[51]

Reaction to the January 1977 proposal was swift and largely negative. One equipment manufacturer, Rydax, represented that its equipment was capable of meeting

---

**42.** *Id.*

**43.** *Id.* ¶ 22 at 133.

**44.** *Id.* ¶ 24 at 134. Announcing that it was putting the burden on applicants to propose the technical coordination plan that would most effectively utilize the spectrum in their particular market area, the Commission stated, "[w]e recognize that in each of these cities there are many variables, such as number of prospective applicants, station locations, the number of prospective systems and channels per system." *Id.* ¶ 18 at 132.

**45.** *Id.* ¶ 7 at 129.

**46.** *Id.*

**47.** *Id.*

**48.** *Id.* "Form L" apparently is a financial report required of RCCs periodically.

**49.** *Id.* ¶ 25 at 134.

**50.** *Id.* ¶ 26 at 134.

**51.** *Id.*

the stated technical standards, but questioned the economic wisdom of any plan that maintained multiple independent, and essentially duplicative, systems.[52] Motorola, another equipment manufacturer, echoed this sentiment and also challenged the Commission's sanguine estimates of implementation costs and increased spectral efficiencies.[53] Telocator joined in attacking the technical feasibility and desirability of the proposal. It criticized the Commission's reliance on the "guardband" paging experience, asserting that "guardband" sharing was neither as successful as the Commission implied nor as technically sophisticated as a shared mobile telephone system would need to be.[54] Arguing the inappropriateness of attempting a major technical reorientation of the industry in the context of a limited, stopgap proceeding,[55] Telocator asserted that "[n]o systems operating on the proposed principles exist anywhere today. Thus, any conclusions as to whether they would work at all, or how well, amount to little more than informed speculation."[56] After citing the Commission's repeated reference to the virtues and values of competition, Telocator reproved the Commission for proposing a technical plan that pushed currently independent, competing RCCs into highly cooperative or even joint business operations.[57] It also pointed out as inconsistent with the Commission's emphasis on competition the adoption of technical criteria that only one manufacturer, Rydax, had the equipment to meet, and accused the Commission of thereby creating the possibility of a monopoly in equipment supply.[58]

On the financial impact of the proposal, Telocator challenged the Commission's use of Form L data and questioned the validity of the conclusions drawn therefrom.[59] Reaffirming its disagreement with an open entry policy, Telocator expressed even more deep-seated disapproval of perpetual open entry, and charged that the Commission had improperly ignored the problem of *economically* mutually-exclusive applications.[60] It reasoned that a showing of public need for additional *service* was not equivalent to a showing of need for additional service *providers*,[61] and contended that the Commission could not determine that approval of particular licenses served the "public interest, convenience, and necessity"[62] if it abrogated the requirement that applicants demonstrate a need for their entry into the market.[63] Additionally, Telocator argued that, without some temporal limitation on entry by new carriers, RCCs would have difficulty obtaining financial backing because investors could never gauge the strength and extent of potential competition.[64]

Despite the criticism the January 1977 proposal had elicited, the Commission adopted it without significant modification, in what hereinafter will be referred to as

52. See Brief for Petitioner at 22.

53. See Comments of Motorola, Inc., filed in Docket Nos. 18261 & 21039, at 3, Joint Appendix (J.App.) 152a.

54. Comments of National Association of Radiotelephone Systems [now Telocator] in Docket Nos. 18261 & 21039, at 14–15, J.App. 112a–113a [hereinafter cited as Comments].

55. Id. at 8–12, J.App. 106a–110a.

56. Id. at 25, J.App. 123a.

57. Id. at 15–16, J.App. 113a–114a. See also Comments of Motorola, supra note 53, at 4, J.App. 153a.

58. Comments, supra note 54, at 32, J.App. 130a.

59. Petition of National Association of Radiotelephone Systems [now Telocator] for Reconsideration in Docket Nos. 18261 & 21039, at 16–17, J.App. 93a–94a [hereinafter cited as Petition for Reconsideration].

60. Comments, supra note 54, at 20–21, J.App. 118a–119a.

61. Id. at 19 n.6, J.App. 117a. See also Petition for Reconsideration, supra note 59, at 6, J.App. 83a.

62. See 47 U.S.C. § 309(a) (1976).

63. Comments, supra note 54, at 18–19, J.App. 116a–117a.

64. Id. at 29, 34, J.App. 127a, 132a.

the "*1978 Memorandum*." [65] Admitting that "no one plan is perfect," the Commission reasserted its belief that its proposal would produce "better spectrum utilization" as well as permit "the greatest degree of flexibility in implementing trunked channel systems." [66] On the latter point, the Commission elaborated:

> Each market area has its own unique problems, and no particular approach will work for all market areas. The rules that we are adopting recognize this problem. Therefore, if there exists a market where the carriers cannot agree on using a common terminal as a means of managing the joint-use of frequencies, then independently the carriers can use wireline or "off-the-air" monitoring to coordinate separate terminals to prevent seizure of a busy channel. [67]

Responding to Telocator's criticism of its reliance on the "guardband" system as evidence of the feasibility of sharing, the Commission pointed out that "the parties have not submitted any data to substantiate their claim" that "guardband" sharing was unsuccessful, and asserted that "to the best of our knowledge" that frequency-sharing plan was working. [68]

The Commission also noted the misgivings several commentators had expressed about possible anticompetitive effects of its proposal, but declared that "[a]t this time, ... we do not find the potential anticompetitive concern to be sufficiently serious to outweigh our consideration of the public benefits to be derived from the plan. . . ." [69] It warned, however, that "we will not hesitate to take action" if anticompetitive conduct actually ensues. [70] As for the fact that Rydax was the only manufacturer that claimed ability to provide acceptable off-the-air monitoring equipment at reasonable cost, the Commission did not find this an "anticompetitive problem": "Our rules do not prevent any other manufacturer from designing and developing equipment for 'off-the-air' monitoring, and in any event, 'off-the-air' monitoring must still compete with other methods of technical coordination." [71]

Addressing the open entry issue, the Commission discussed in greater detail its use of Form L data. It pointed out that, according to these reports, the percentage of RCCs reporting losses had dropped from 39 percent in 1970 to 27.7 percent in 1976, a figure comparing favorably with the 38 percent of "miscellaneous common carriers" that reportedly had operated at a loss in 1976. [72] The Commission also noted that the data indicated an average rate of return for profitable RCCs of 27.1 percent. [73] On these figures, the Commission reasoned that the urban RCC industry was clearly a "mature,

---

65. *Memorandum Opinion and Order for Docket No. 21039,* 69 F.C.C.2d 1555 (1978) [hereinafter cited as *1978 Memorandum*].

One element of the 1977 proposal that *was* modified was the rule governing channel loading on the new frequencies. Channel loading refers to the maximum number of mobile units that can be accommodated before the grade of service diminishes to an unacceptable point. The Commission originally proposed a traffic limit of 100 mobile units per channel; once that number was reached, no new units could be added except as replacements. *Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, supra* note 29, 63 F.C.C.2d ¶ 27 at 134–135. Under this channel-loading scheme, then, 1200 subscribers would be permitted on each 12-channel block.

This proposal met with severe criticism and the Commission, in its *1978 Memorandum,* responded by lowering the loading figure to 40 mobiles per channel. It termed this a "con-

servative" limit, and announced an intention to increase gradually the authorized number of mobiles per channel on the basis of each system's actual experience until optimum channel usage was achieved, *1978 Memorandum, supra,* 69 F.C.C.2d ¶¶ 38–39, 41–42 at 1566–1567.

66. *Id.* ¶ 32 at 1565.

67. *Id.*

68. *Id.* ¶ 35 at 1565.

69. *Id.* ¶ 53 at 1570.

70. *Id.*

71. *Id.*

72. *Id.* ¶ 28 at 1564.

73. *Id.* ¶ 29 at 1564.

profitable business." [74] This conclusion, coupled with the "constant demand for new frequencies and the historical growth in traffic," led the Commission to reaffirm its belief that open entry would not result in ruinous competition for existing carriers.[75] Finding that open entry would provide the public with a "greater choice of service," the Commission again rejected the plea to limit access to the new frequencies to existing RCCs.[76]

For similar reasons, the Commission also refused to alter its position that a cutoff date for new entry was unnecessary. It found that arguments about dire investment consequences of perpetual open entry were unsubstantiated by any factual data, and reiterated its view that competition "allows the public to get the best possible service at the lowest cost available." [77] After rejecting all commentator-suggested reasons for imposing a cutoff, however, the Commission advanced a ground of its own for some temporal restriction on new entrants. In order for a shared-use plan to work, the agency noted, every RCC's equipment had to be technically compatible with that of every other RCC in the market area; since there were at least three possible methods of achieving such coordination, there clearly had to be some way for the carriers in each market to know with whom to negotiate in choosing among them. Accordingly, to prevent indefinite delays in operation occasioned by carriers waiting to see who else might apply before finalizing a choice of technical method, the Commission announced institution of a limited cutoff rule:

> For any given market area, all applicants who file within 60 days of the public notice announcing the filing of an application for that market area will be required to work out technical arrangements with each other .... Any entity

which files subsequent to the 60-day period must conform its application to be technically compatible with whatever technical arrangements were worked out by those who filed within the 60-day period .... In other words, full open entry will prevail, but those applicants who file within the initial 60-day period will be able to identify other potential participants and participate in establishing the necessary technical arrangements for workable systems.[78]

Thus, the cutoff rule adopted merely affected which entrants could participate in the initial decision on technical coordination. Once a method had been chosen for a particular market, there was no restriction on the number of new carriers who could enter that market with conforming equipment.

Lastly, the Commission reiterated its position that applicants would not have to demonstrate a public need for their proposed systems:

> Because we will allow a number of applicants to apply for licenses, and because grant of one license will not preclude the grant of another, we do not see the usual comparative problem of issuing a license to the one who better identifies the market for radiotelephone service. Nor do we see the problem of a party receiving a license but not utilizing the spectrum because new parties may apply at any time and may use the system if it is not [loaded to capacity].[79]

The Commission's final statement on these issues came in an order, which we denominate the "*1980 Memorandum*," denying a petition by another RCC organization for partial reconsideration.[80] Responding to attacks on the technical feasibility of frequency sharing, the Commission again explained that its information led it to be-

---

74. *Id.* ¶ 31 at 1564.

75. *Id.*

76. *Id.*

77. *Id.* ¶ 44 at 1567.

78. *Id.* ¶¶ 46–47 at 1568. See also *id.* ¶ 45 at 1567–1568.

79. *Id.* ¶ 48 at 1569.

80. *Memorandum Opinion and Order for Docket No. 21039,* 77 F.C.C.2d 201 (1980) [hereinafter cited as *1980 Memorandum* ].

lieve that the "guardband" system was successfully serving numerous paging customers.[81] It also observed that during the most recent license renewal period, none of the licensees sharing the paging frequencies had sought leave to terminate their operations, and adverted again to the absence of evidence that "guardband" sharing was a failure.[82] On the question of availability of technically-acceptable hardware for off-the-air monitoring, the Commission pointed to Rydax's representations of ability to manufacture conforming equipment.[83] It went on, however, to profess:

> [E]ven if it happens that off-the-air monitoring is too expensive or in other ways not feasible, this would not alter the viability of our new rules because off-the-air monitoring is only one of several approaches that carriers can use to comply with the rules. In other words, the viability of off-the-air monitoring is irrelevant because carriers can use wireline monitoring, a common terminal, or any other approach they can agree on to avoid harmful interference.[84]

Addressing further complaints about the absence of a traditional cutoff rule, the Commission again refused to limit new entry. It acknowledged the argument that a temporal restriction on entry might facilitate the RCCs' search for financial backing by lessening the investment risk, but dismissed the concern as overstated.[85] The Commission posited that carriers who apply early and become established will have the advantage over newcomers; for the latter to succeed, it theorized, they must be able to offer a "far superior combination of price and quality."[86] Reasoning that such superiority would redound to the public interest, the Commission once more reiterated its allegiance to a policy of perpetual open entry.[87] It explained that even if newcomers did not actually enter the market to bring upgraded service, the continual threat of competition would spur existing carriers to maintain high-quality service.[88] Indeed, the Commission was so taken with the perceived virtues of a competitive environment that it announced its intention to continue to license new applicants even after the shared channels had become so loaded by existing carriers that they could accommodate no additional mobile units.[89]

The Commission did, however, modify somewhat the limited, 60-day cutoff rule established in its *1980 Memorandum*. Frustrated that it had yet to receive a technical coordination plan adopted by consensus of all license applicants in any of the urban markets, the Commission announced a change in strategy:

> [O]ur theory was that a consensus would be reached in most cities, and where it was not reached we would hold a comparative hearing on the issue of technical method of operation. However, because of the lack of cooperation, we would be obligated to hold many hearings under the present rules. As a result, another approach is advisable .... The rules as written presume unanimous agreement on technical arrangements. Nevertheless, it is the requirement of unanimous agreement that has obstructed the licensing process, and upon further reflection,

81. *Id.* ¶¶ 74–75 at 219–220.

82. *Id.*

83. *Id.* ¶ 76 at 220.

84. *Id.* ¶ 77 at 220.

85. *Id.* ¶¶ 36–37 at 210.

86. *Id.* ¶ 37 at 210–211.

87. *Id.* ¶¶ 38, 40 at 211.

88. *Id.* ¶ 39 at 211.

89. *Id.* ¶ 42 at 211–212. See generally note 65 *supra*. The Commission stated, "[t]he fact that the channels are saturated with mobile units will not preclude grant of an application. However, the newcomer must realize that it may not place any mobile units on the system until there is room for additional mobiles as defined by our channel loading criteria." *1980 Memorandum, supra* note 80, ¶ 42 at 211–212.

In this order the Commission, at the request of the RCC organization petitioning for rehearing, increased the channel-loading figure to 60 mobiles per channel, thus fixing the capacity of each 12-channel block at 720 mobile subscribers. *Id.* ¶¶ 18–20 at 206.

we do not believe that unanimous agreement is necessary. We will thus modify the rules to allow us to approve technical methods of operation that do not receive unanimous agreement.[90]

The Commission then outlined a plan whereby a second 60-day period, termed a "coordination period," [91] would begin to run on expiration of the initial 60 days during which all carriers wishing to participate in the choice of technical method had to file their applications. If, by the end of this coordination period, unanimity on a technical method had not been obtained, whatever method had received a plurality of votes would be submitted to the chief of the Commission's Common Carrier Bureau, who then would scrutinize the proposal to ensure it was nondiscriminatory, in the public interest, and otherwise in conformity with the Communications Act.[92] If the plurality proposal was found unacceptable, the method garnering the next highest number of votes would be scrutinized, and so on until a plan was finally approved. No comparative hearings would be held nor, insofar as the 1980 *Memorandum* reveals, would there be any notice and comment period.

Recognizing that some question was raised about whether the plurality procedure would subvert statutorily-guaranteed rights to a comparative hearing in any instance of mutually-exclusive applications, the Commission took care to delineate its view of the mandate of Section 309(e) [93] and *Ashbacker*[94] in such circumstances. Initially, the Commission reasoned, "approval of one technical coordination method does not preclude the grant of any particular application because all parties will be free to amend their applications to comply with the technical plan." [95] Additionally, it explained,

[a]lthough it can be argued that approval of one technical method of operation precludes approval of another which may arguably be better, we must remember that the technical plan will be reviewed to determine whether it will satisfy the public interest. Thus, these procedures preclude implementation of a plan that does not satisfy minimum technical and other public interest standards. As far as the argument that another plan may be better is concerned, we do not consider the types of differences that would exist in technical coordination plans significant enough to warrant a formal hearing, and courts have never required the Commission to make findings concerning differences "... which are frivolous or wholly unsubstantial ...." [96]

The Commission further asserted that it could consider the urgency of timely resolution of the issue at hand as a factor justifying refusal to hold comparative hearings, and expressed its resolve to pursue its "concern of expeditiously providing service at the expense of resolving relatively unimportant differences" in a hearing.[97]

One additional piece of information is necessary to complete the factual background of the instant challenge. Although, as we have said, nothing in the 1980 *Memorandum* states that the plurality plan submitted for approval to the chief of the Common Carrier Bureau would be put out for public notice and comment, the Commission's regulations call for such a procedure,[98] and materials submitted to us by the Commission indicate that the notice-and-

**90.** *Id.* ¶¶ 45–46 at 212–213.

**91.** *Id.* ¶ 47 at 213.

**92.** If no such method received a plurality, a technical coordination plan would be selected at random for scrutiny by the Commission Carrier Bureau. *Id.* ¶¶ 48 n.10, 50 at 213.

**93.** 47 U.S.C. § 309(e) (1976).

**94.** *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

**95.** *1980 Memorandum, supra* note 80, 77 F.C. C.2d ¶ 53 at 214.

**96.** *Id.* ¶ 54 at 214 (footnotes omitted), quoting *Johnston Broadcasting Co. v. FCC,* 85 U.S.App. D.C. 40, 46, 175 F.2d 351, 357 (1949).

**97.** *1980 Memorandum* ¶ 55 at 215.

**98.** See 47 C.F.R. § 22.501(*l*)(9)(iii)–(iv) (1981).

comment process is in fact being implemented.[99] As of May, 1981, plurality plans had been noticed for comment in ten markets,[100] and three of these systems had proceeded to the point of actual operation.[101] In all three markets with operational plans, a single, integrated system is being employed,[102] two using Rydax and the other Motorola equipment.[103]

## II

In its petition for review, Telocator attacks virtually every aspect of the Commission's plan for dedicating the 24 new mobile telephone channels to RCC use except the initial reallocation decision itself. We have reviewed the evolution of the proposal at some length, not only to explain how the Commission's reasoning evolved, but also to underscore how thoroughly and often the questions raised in this court were debated before the agency. Telocator's complaints, by our estimate, are not frivolous, but we conclude that it has not succeeded in demonstrating that the Commission's resolution of the issues presented by the reallocation plan was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [104] Recently we summarized the criteria governing application of this standard of review:

[The] agency action is presumed to be valid in the absence of a substantial showing to the contrary. The court's review is not merely a summary endorsement, however, but should be searching and careful. While the level of review is not to be perfunctory it is relatively narrow and designed only to insure that the agency's decision is not contrary to law, is rational, has support in the record, and is based on a consideration of the relevant factors. This includes the agency's addressing the significant comments made in the rulemaking proceeding .... [W]e will demand that the Commission consider reasonably obvious alternative ... rules, and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review. At the same time, however, our review of the Commission's factual, and particularly its policy, determinations will perforce be a narrow one, limited to insuring that the Commission has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record. Finally, we must see "whether those facts and legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made." [105]

99. Brief for Respondent at Addendum A (listing for each urban area the date on which a plurality plan was publicly noticed).

100. Boston, Chicago, Dallas-Fort Worth, Houston, Los Angeles, Miami, New York, Philadelphia, San Francisco, and Washington, D. C. *Id.*

101. Chicago, Dallas-Fort Worth, and Houston. See *id.;* Reply Brief for Petitioner at 31 n.43.

102. Reply Brief for Petitioner at 31.

103. *Id.* at 32.

104. 5 U.S.C. § 706(2)(A) (1976).

105. *NAACP v. FCC,* 221 U.S.App.D.C. 44, 49, 682 F.2d 993, 998 (1982), (citations omitted), in part quoting *Natural Resources Defense Council v. SEC,* 196 U.S.App.D.C. 124, 146, 606 F.2d 1031, 1053 (1979). On the presumption of validity, see *Loyola Univ. v. FCC,* 216 U.S.App.D.C. 403, 407, 670 F.2d 1222, 1226 (1982); *American Radio Relay League v. FCC,* 199 U.S.App.D.C. 293, 297, 617 F.2d 875, 879 (1980). On the requirement of rationality, see *Loyola*

*Univ. v. FCC, supra,* 216 U.S.App.D.C. at 407, 670 F.2d at 1226; *City of Chicago v. FPC,* 147 U.S.App.D.C. 312, 325, 458 F.2d 731, 744 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1074, 31 L.Ed.2d 808 (1972); *Columbia Broadcasting Sys. v. FCC,* 147 U.S.App.D.C. 175, 185 n.66, 454 F.2d 1018, 1028 n.66 (1971). On the requirement of record evidentiary support, see *Ritter Transp. v. ICC,* 221 U.S.App.D.C. 312, 313–314, 684 F.2d 86, 87–88 (1982); *Doe v. Hampton,* 184 U.S.App.D.C. 373, 379 n.15, 566 F.2d 265, 271 n.15 (1977); *Pillai v. CAB,* 158 U.S.App.D.C. 239, 248, 485 F.2d 1018, 1027 (1973). On the requirement that the agency take a "hard look" at the relevant factors, see *Ritter Transp. v. ICC, supra,* 221 U.S.App.D.C. 313 314, 684 F.2d at 87–88; *Loyola Univ. v. FCC, supra,* 216 U.S.App.D.C. at 408, 670 F.2d at 1227; *United States v. FCC, supra* note 2, 209 U.S.App.D.C. at 103, 652 F.2d at 96; *Action for Children's Television v. FCC,* 183 U.S. App.D.C. 437, 457–458, 564 F.2d 458, 478–479 (1977); *Columbia Broadcasting Sys. v. FCC, supra,* 147 U.S.App.D.C. at 184, 454 F.2d at 1027; *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841,

## A. *Feasibility of Frequency Sharing*

All parties agree that the new frequencies should be allocated in a way that permits RCCs to take advantage of the increased spectral efficiencies possible with channel trunking. Telocator contends, however, that the Commission's continued adherence to a plan involving simultaneous shared access by multiple carriers to an entire frequency block, in the face of diverse attacks on the technical and economic feasibility of such a scheme, was the product of pure obstinancy rather than reasoned decision-making.[106] As an instance of claimed arbitrariness, it points to what it discerns as the Commission's shift in emphasis over time from support for off-the-air monitoring as the premier method of technical coordination to advocacy of a common system as the preferred mode of operation. It criticizes adoption of technical specifications that allegedly give one manufacturer, Rydax, a de facto monopoly, and condemns a scheme that assertedly requires a major technical and economic dislocation of the industry in the context of an essentially stopgap measure.

■ We begin our evaluation of these challenges by recalling two cardinal points. First, the Commission is empowered by the Communications Act to foster innovative methods of exploiting the radio spectrum in order to "generally encourage the larger and more effective use of radio." [107] Second, when piloting such a regulatory course, the Commission functions as a policymaker and, inevitably, a seer—roles in which it will be accorded the greatest deference by a reviewing court. As oft has been repeated, the court will not pass upon the wisdom of the agency's perception of where the public interest lies,[108] nor will it require "complete factual support" in the record when the agency's ultimate conclusions necessarily rest on "judgment and prediction rather than pure factual determinations." [109]

851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *WAIT Radio v. FCC*, 135 U.S.App.D.C. 317, 320, 321, 418 F.2d 1153, 1156, 1157 (1969); *Radio Relay Corp. v. FCC*, 409 F.2d 322, 326 (2d Cir. 1969). On the requirement that the agency address proffered comments and alternatives, see *Las Cruces Television Cable v. FCC*, 207 U.S.App.D.C. 116, 123, 645 F.2d 1041, 1048 (1981); *Alabama Power Co. v. Costle*, 204 U.S.App.D.C. 51, 112–113, 636 F.2d 323, 384–385 (1979); *Rodway v. Department of Agriculture*, 168 U.S.App.D.C. 387, 394–395, 514 F.2d 809, 816–817 (1975); *Pillai v. CAB, supra*, 158 U.S.App.D.C. at 250–251, 485 F.2d at 1029–1030. On the requirement that the approach chosen be reasonably responsive to the problem demonstrated, see *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 796, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697, 715 (1978); *Action for Children's Television v. FCC, supra*, 183 U.S.App.D.C. at 458, 564 F.2d at 479.

**106.** Presence in the record of substantial quantities of adverse comment may signal clear error of agency judgment. Only recently we reminded, however, that "[a]n agency is not required to mold its decision to accord the weight of the comments it receives." *MCI Telecommunications Corp. v. FCC*, 219 U.S.App.D.C. 389, 396 n.39, 675 F.2d 408, 415 n.39 (1982).

**107.** 47 U.S.C. § 303(g) (1976); *Rogers Radio Communication Servs. v. FCC*, 193 U.S.App.D.C. 71, 76, 593 F.2d 1225, 1230 (1978); *National Ass'n of Regulatory Util. Comm'rs v.*

*FCC, supra* note 6, 173 U.S.App.D.C. at 422, 525 F.2d at 639. See *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521, 533–534 (1981) (emphasizing Commission's broad discretion to determine how best to achieve the goal of securing the maximum benefits of radio to all, and explaining that a court will not disturb its judgment on the optimal method of encouraging effective use of radio).

**108.** *E.g., FCC v. WNCN Listeners Guild, supra* note 107, 450 U.S. at 594, 596, 101 S.Ct. at 1274, 1275, 67 L.Ed.2d at 534, 535; *RCA v. United States*, 341 U.S. 412, 420, 71 S.Ct. 806, 810, 95 L.Ed. 1062, 1071 (1951); *National Broadcasting Co. v. United States*, 319 U.S. 190, 224, 63 S.Ct. 997, 1013, 87 L.Ed. 1344, 1367 (1943); *NAACP v. FCC, supra* note 105, at 1003; *United States v. FCC, supra* note 2, 209 U.S.App.D.C. at 103, 652 F.2d at 96; *MCI Telecommunications Corp. v. FCC, supra* note 106, 219 U.S.App.D.C. at 394, 398, 675 F.2d at 413, 417; *Loyola Univ. v. FCC, supra* note 105, 216 U.S.App.D.C. at 407, 670 F.2d at 1226; *Greater Boston Television Corp. v. FCC, supra* note 105, 143 U.S.App.D.C. at 393, 405, 444 F.2d at 851, 863; *General Tel. Co. v. United States*, 449 F.2d 846, 858 (5th Cir. 1971).

**109.** *FCC v. WNCN Listeners Guild, supra* note 107, 450 U.S. at 594–595, 101 S.Ct. at 1274, 67 L.Ed.2d at 534. See, *e.g., NAACP v. FCC, supra* note 105, 221 U.S.App.D.C. at 52, 682

In proposing nonexclusive use of the reallocated frequencies, the Commission relied in part on shared usage of the "guardband" paging channels.[110] Telocator, while generally critical of this reliance throughout the rulemaking process, offered little more in the way of specific comment than to remark that the most successful "guardband" systems used a common terminal, and to state that it knew of one system, not identified, that had attempted off-the-air monitoring and had failed.[111] The first of these observations hardly undercut the Commission's plan, for operation of a common system was one of the coordination methods it suggested for implementing the new mobile telephone frequencies.[112] The latter assertion lacked the specificity requisite to demand the Commission's attention. Of which system was Telocator speaking? What were the circumstances of the reportedly unsuccessful experience with off-the-air monitoring? Repeatedly, the Commission underscored Telocator's failure to submit evidence to support its claim that "guardband" sharing was unsuccessful;[113] repeatedly, none was forthcoming.[114] It was not unreasonable, then, for the Commission to believe, in view of the absence of user complaints or carrier requests to terminate shared paging operations,[115] that those operations indeed were functioning effectively.

The Commission also relied upon its conviction that there was currently available technology capable of sustaining shared usage without an unacceptable level of interference.[116] Attacking the reasonableness of this assumption, Telocator accuses the Commission of having shifted its ground from indicating that off-the-air monitoring would be the preeminent method of technical coordination to pressuring RCCs into operation of common systems. After examining the progression of memoranda and comment proposals that the Commission has authored on the point since 1971, we think Telocator has exaggerated the significance of the variation in the agency's position over the years.

From the outset, the Commission proffered three possible methods of coordination: operation of a common system, interconnection by wireline, and off-the-air monitoring.[117] With one glaring but ultimately

---

F.2d at 1001; *Stereo Broadcasters, Inc. v. FCC,* 209 U.S.App.D.C. 229, 234, 652 F. 2d 1026, 1031 (1981); *United States v. FCC, supra* note 2, 209 U.S.App.D.C. at 100, 652 F.2d at 93; *Midwest Television, Inc. v. FCC,* 138 U.S.App.D.C. 228, 234, 426 F.2d 1222, 1228 (1970); *WBEN, Inc. v. United States,* 396 F.2d 601, 610–613 (2d Cir.), *cert. denied,* 393 U.S. 914, 89 S.Ct. 240, 21 L.Ed.2d 200 (1968); *General Tel. Co. v. United States, supra* note 108, 449 F.2d at 857–858; *Washington Util. & Transp. Comm'n v. FCC, supra* note 1, 513 F.2d at 1160.

**110.** See text accompanying note 38 *supra.*

**111.** Comments, *supra* note 54, at 15 & n.3, J.App. 113a.

**112.** See note 40 *supra* and accompanying text.

**113.** See, *e.g., 1978 Memorandum, supra* note 65, 69 F.C.C.2d ¶ 35 at 1565; *1980 Memorandum, supra* note 80, 77 M.C.C.2d ¶ 75 at 220.

**114.** Telocator seems to have taken the position that, because the Commission interjected the "guardband" issue into the proceedings now before us, the agency had the responsibility of proving in the first instance that the shared paging system was successful before Telocator had any obligation to adduce evidence to the contrary. See Memorandum from Attorneys for Telocator to Larry F. Darby, Chief, Common Carrier Bureau (Oct. 31, 1978), at 4–5, J.App. 205a–206a. Without embarking upon an extended discussion of burdens of proof, we think this view is manifestly unsound. Telocator well knew that the performance of the "guardband" operations was a material part of the Commission's analysis; if it had evidence on the point, it should have submitted it. Compare *NAACP v. FCC, supra* note 105, at 1000–01; *City of Chicago v. FPC, supra* note 105, 147 U.S.App.D.C. at 328–329, 458 F.2d at 747–748. Whatever lingering vitality the "sporting theory" of justice may retain in the trial courtroom, it has no place in a rulemaking proceeding, in which one's cards, to be of any value, must all be laid on the table at the outset.

**115.** See notes 81–82 *supra* and accompanying text.

**116.** See note 38 *supra* and accompanying text.

**117.** See notes 40–42 *supra* and accompanying text.

harmless deviation we later discuss,[118] the Commission has remained of the view that all three are technically-feasible options.[119] True it is that the Commission originally presented off-the-air monitoring as an economical, easily implemented method of outfitting off-the-shelf equipment for frequency sharing, and that over the course of the proceeding the Commission's enthusiasm for this method became less pronounced. We think, however, that this reorientation—if such it was—represented not the mindless inconsistency and equivocation that signals arbitrariness [120] but rather a salutary responsiveness to information generated as rulemaking progressed. It is perfectly proper for an agency's approach to a problem to evolve over the course of the proceeding,[121] particularly in one as lengthy as this. Indeed, we often have reminded administrators that the *raison d'etre* of the notice and comment process is to add to the fund of knowledge from which the agency draws guidance in policymaking.[122]

Moreover, in this case the Commission was beating a new path, and it is not even surprising, let alone unlawful, that it discovered that one direction was not quite as promising as expected. Told that off-the-air monitoring was more difficult to achieve than it had predicted, and that only one manufacturer currently offered substantial-

ly-conforming equipment, the Commission not unnaturally focused more attention on the common system approach. It amended its technical specifications to facilitate use of much existing equipment whenever a common system was employed.[123] Instead of being the sinister attempt to coerce RCCs into joint operations that Telocator suggests, we view this modification as a sensible adjustment to pragmatic concerns of the RCC industry in circumstances where the Commission believed that this accommodation would not endanger its goal of multi-carrier shared usage.

There is only one element in the Commission's treatment of the technical-coordination problem that gives us pause: the Commission's startling characterization, in its 1980 *Memorandum,* of the technical viability of off-the-air monitoring as an "irrelevant" issue.[124] From its first appearance in the 1971 notice of rulemaking, off-the-air monitoring had been presented by the Commission as a technical cornerstone of the frequency-sharing proposal.[125] Throughout the several subsequent phases of the proceeding, that method's merits and demerits had been hotly debated; always, the Commission maintained the position that off-the-air monitoring could be accomplished through currently available technology. For the Commission, after engaging in al-

**118.** See text accompanying notes 124–127 *infra.*

**119.** See, *e.g., 1978 Memorandum, supra* note 65, 69 F.C.C.2d ¶ 32 at 1565; *1980 Memorandum, supra* note 80, 77 F.C.C.2d ¶ 54 n.13 at 214.

**120.** See, *e.g., Columbia Broadcasting Sys. v. FCC, supra* note 105, 147 U.S.App.D.C. at 181–182, 454 F.2d at 1034–1035.

**121.** See, *e.g., WJG Tel. Co. v. FCC,* 219 U.S.App.D.C. 367, 370, 675 F.2d 386, 389 (1982); *MCI Telecommunications Corp. v. FCC, supra* note 106, 219 U.S.App.D.C. at 394–395, 675 F.2d at 413–414; *Alabama Power Co. v. Costle, supra* note 105, 204 U.S.App.D.C. at 112–113, 636 F.2d at 384–385; *Rogers Radio Communications Servs. v. FCC, supra* note 107, 193 U.S.App.D.C. at 77–78, 593 F.2d at 1231–1232. See generally *American Trucking Ass'ns v. Atchison, T. & S.F. Ry.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847, 860 (1967).

**122.** See, *e.g., WJG Tel. Co. v. FCC, supra* note 121, 219 U.S.App.D.C. at 370, 675 F.2d at 389; *City of Chicago v. FPC, supra* note 105, 147 U.S.App.D.C. at 324–325, 458 F.2d at 743–744. See generally *Action for Children's Television v. FCC, supra* note 105, 183 U.S.App.D.C. at 450, 564 F.2d at 471.

**123.** Responding to comments of a consulting engineer, the Commission decided to revise the regulation setting forth signaling-speed criteria to permit use of existing, slower-signaling equipment whenever all RCCs in the market area "agree on the same method of technical operation." *1980 Memorandum, supra* note 80, 77 F.C.C.2d ¶¶ 61–62 at 216–217.

**124.** See text accompanying note 84 *supra.*

**125.** See text accompanying notes 40–43 *supra.*

most a decade of controversy over the point, to announce that it did not matter anyway lends plausibility to Telocator's picture of an agency clinging blindly and irrationally to a plan that for some wild reason has struck its fancy. Indeed, had the Commission said no more than this, we would be inclined to share Telocator's view. The assertion that the viability of off-the-air monitoring is irrelevant was preceded, however, by the Commission's unequivocal reaffirmation that the method would work and that Rydax was "willing and able" to produce substantially-conforming equipment.[126] When taken in context, then, it appears that the Commission's disquieting statement functioned merely as a fallback position flung out, perhaps, in understandable, though most unfortunate, frustration to end once and for all arguments about whether off-the-air monitoring would succeed. We do not condone the Commission's cavalier handling of this point; lacking, perhaps, the "courage of its convictions," [127] the Commission not only opened itself to accusations of capriciousness but also made itself look somewhat absurd. Because however, the Commission's primary hypothesis—that RCC use of off-the-air monitoring was feasible in light of the availability of the requisite equipment—was, by our estimation, a reasonable conclusion having ample support in the record, we do not regard the defects of its alternative rationale as fatal to its cause.

The Commission's belief that off-the-air monitoring is a viable method of coordination was originally grounded in its "consider[ation] in detail" of two system designs employing different means for locating and marking a clear channel.[128] Telocator's response asserted that (1) "[n]o systems operating on the proposed principles exist anywhere today"; [129] (2) shared usage is a "radical departure from the technical bases upon which ... frequencies have been uniformly assigned to date"; [130] (3) the type of equipment currently enjoying the widest usage would not meet the new technical specifications; [131] (4) whether an unacceptable level of interference would result from shared usage is unknown; [132] and (5) of existing equipment manufacturers, only Rydax held out any "reasonable hope" that off-the-air monitoring could be implemented successfully.[133] In no subsequent presentation did Telocator present any more specific technical objection. Given the nature of these comments, we perceive no basis for overruling the Commission's conclusion that Telocator had not submitted sufficient data to raise a substantial question about the feasibility of off-the-air monitoring.[134]

That the plan was an innovative departure from past licensing practice could hardly have come as news to the Commission. The agency had already announced it was looking for spectral assignment and utilization techniques which would raise the level of efficiency with which land mobile communications could employ new channel

126. See *1980 Memorandum, supra* note 80, 77 F.C.C.2d ¶ 76 at 220.

127. *Columbia Broadcasting Sys. v. FCC, supra* note 105, 147 U.S.App.D.C. at 193, 454 F.2d at 1036 (concurring opinion).

128. *Memorandum Opinion and Order and Notice of Proposed Rulemaking for Docket Nos. 18261 & 21039, supra* note 29, 63 F.C.C.2d ¶ 22 at 133. One of the systems studied used sub-audible tone coded squelch; the other employed digital message preambles. *Id.* Motorola's comments alluded to these techniques with no suggestion that they were infeasible. See Comments of Motorola, *supra* note 53, at 3, J.App. 152a. Motorola's criticism of off-the-air monitoring centered on the assertedly wasteful duplication of equipment wrought by continua-

tion of multiple independent facilities, see *id.* at 3–4, J.App. 152a–153a; text accompanying note 147 *infra;* it did not claim that this method of coordination was technically impossible.

129. Comments, *supra* note 54, at 25, J.App. 123a.

130. *Id.*

131. *Id.* at 26, J.App. 124a.

132. *Id.* at 28–29, J.App. 126a–127a.

133. *Id.* at 31–32, J.App. 129a–130a.

134. See *1978 Memorandum, supra* note 65, 69 F.C.C.2d ¶ 49 at 1569.

space.[135]  In view of the increasing congestion on the radio spectrum and the continued growth in demand for communication services, we cannot fault the Commission's policy determination that novel methods evincing the potential for greater efficiency ought be tried.  Nor can we brand a clear error of judgment [136] the Commission's conclusion that its frequency-sharing plan possessed that potential.  To insist upon concrete proof that a proposed innovation will succeed without undesirable side effects would be effectively to relegate the Commission to preserving the status quo.[137]  All that is required is that the Commission set forth generally the bases for its informed prediction that the plan should be workable and beneficial.[138]  Here, the Commission had reviewed two technical designs and had at least one manufacturer's assurance it could produce the necessary equipment. This representation was never contravened. The inability of other brands to conform to off-the-air monitoring specifications, while not irrelevant, was not dispositive. "[G]iven a justifiable fact situation, the Commission has power . . . to promulgate standards . . . that result in rejecting all but one" [139] of several equipment systems.

Moreover, the inutility of existing non-Rydax equipment under the frequency-sharing plan now appears to extend only to instances where off-the-air monitoring is selected as the coordination method.  As earlier noted,[140] the Commission amended its specifications to delete, for markets where RCCs elect to follow a common system approach, certain technical requirements that had excluded much commonly-used equipment.  Although Telocator strongly objects to the loss of entrepreneurial freedom assertedly occasioned by adoption of a common system, we do not understand it seriously to contend that frequency sharing is not technically viable when this mode of coordination is employed. In fact, Motorola, the manufacturer of one of the two most popular brands, advocated common systems in its comments.[141]  Additionally, the technical viability of wireline interconnection has not been attacked.

In sum, we sustain as a reasonable and adequately-supported exercise of the Commission's expert judgment its determination that multi-carrier frequency sharing is a technically-feasible means of maximizing use of the new channels.  We turn now to claims that the proposal is not economically feasible.

The more substantial part of Telocator's attack on the economic practicability of fre-

135.  See note 19 *supra* and accompanying text.

136.  See *NAACP v. FCC, supra* note 105, 221 U.S.App.D.C. at 49, 682 F.2d at 998, citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 455 (1974).

137.  See *Washington Util. & Transp. Comm'n v. FCC, supra* note 1, 513 F.2d at 1160 ("Planning necessarily rests upon the acceptance of uncertain forecasts of future events.  No other course is possible if the Commission is to formulate regulatory practices and policies that will enable the industry to satisfy future public needs").  See also *FCC v. RCA Communications,* 346 U.S. 86, 96, 73 S.Ct. 998, 1005, 97 L.Ed. 1470, 1478–1479 (1953); *General Tel. Co. v. United States, supra* note 108, 449 F.2d at 857–858.

138.  *FCC v. WNCN Listeners Guild, supra* note 107, 450 U.S. at 594–596, 101 S.Ct. at 1274–1275, 67 L.Ed.2d at 534–535; *NAACP v. FCC, supra* note 105, 221 U.S.App.D.C. at 52–54, 682 F.2d at 1001–1002; *Stereo Broadcasters, Inc. v. FCC, supra* note 109, 209 U.S.App.D.C. at 234, 652 F.2d at 1031; *United States v. FCC,*

*supra* note 2, 209 U.S.App.D.C. at 90, 652 F.2d at 93; *Midwest Television, Inc. v. FCC, supra* note 109, 138 U.S.App.D.C. at 234, 426 F.2d at 1228.

139.  *RCA v. United States, supra* note 108, 341 U.S. at 416, 71 S.Ct. at 808, 95 L.Ed. at 1069 (sustaining the Commission's choice of a color television transmission system that was not compatible with the great number of receiving units in use).  As for the anticompetitive potential of Rydax's dominance in off-the-air monitoring technology, we agree with the Commission that the situation can be monitored and anticompetitive behavior controlled if and when it arises.  Compare *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 304–05, 665 F.2d at 1122–1123; *National Ass'n of Regulatory Util. Comm'rs v. FCC, supra* note 6, 173 U.S.App.D.C. at 421–422, 525 F.2d at 638–639.

140.  See note 123 *supra* and accompanying text.

141.  See Comments of Motorola, *supra* note 53, at 4, 6, 13, J.App. 153a, 155a, 162a.

quency sharing deals with the Commission's open entry and perpetual entry policies; these will be taken up in a subsequent section.[142] Here we are concerned largely with complaints that implementation of the frequency-sharing proposal will require a significant expenditure unjustified by any realistically-anticipated gain in efficiency of spectrum use and unreasonable in light of the assertedly "limited market potential presented by the [new] allocations." [143]

These cost criticisms focused on the wireline and off-the-air monitoring modes of coordination. Again, we understand the core of Telocator's disagreement with the common system approach to be an asserted loss of RCC autonomy rather than a claim of infeasibility. The Commission early recognized that wireline interconnection "could be costly" if the terminals to be linked were widely separated,[144] but the anticipated expense was never quantified, nor was the distance between RCC installations in the various markets ever surveyed. Thus, although Telocator seems to regard this method as disqualified because of its cost, nothing in the record compels the conclusion that it is prohibitively expensive in all markets.

The cost data presented on off-the-air monitoring, while somewhat more substantial, was hardly extensive. Telocator merely stated that "[t]he cost of off-the-air monitoring devices, by themselves, would add to the cost of existing network plant," [145] and contended that the new allocations were not large enough to justify the investment by either manufacturers or carriers.[146] In proposing that the Commission mandate a common system approach, Motorola argued generally that maintenance of multiple independent facilities with off-the-air monitoring capability was economically inefficient.[147] Rydax was apparently the only commentator to attempt to predict actual cost; it estimated that off-the-air monitoring hardware would raise equipment prices by approximately three percent.[148]

This record clearly does not require a finding that shared use of the new frequencies is economically impracticable. The Commission was well within its prerogative in accepting Rydax's cost estimate, particularly when the contrary position was composed largely of indefinite and unsupported laments that the new equipment would cost more. As for Telocator's assertion that the new allocations offered only a very limited market potential inadequate to justify added expense, it must be remembered that, although the rulemaking proceeding under review involved but a fairly small, stopgap measure for land mobile communications services as a whole, its potential for the RCC industry was, relatively speaking, quite considerable. The reallocation more than doubled the frequencies available for RCC operations.[149] Although Telocator may hope and expect that this is just the beginning of an expansion of nonwireline mobile telephone service, we cannot accept its characterization of a reallocation enlarging RCC frequency access by more than one hundred percent as a very limited development having little market potential. A major expansion of operating capacity such as this was not an inappropriate occasion for the Commission to begin to steer the indus-

142. See Part II(B) *infra*.

143. Comments, *supra* note 54, at 31, J.App. 129a.

144. See note 41 *supra* and accompanying text.

145. Comments, *supra* note 54, at 27, J.App. 125a. One of Telocator's main cost complaints was that existing mobile units are not capable of operating on the reallocated frequency band—a complaint directed against the location of the new channels rather than against the technological demands of shared usage. *Id.* at 26–27, J.App. 124a–125a.

146. *Id.* at 26–35, J.App. 124a–133a. This latter concern seems not to have borne out, for the Commission has received numerous applications in various market areas for the new frequencies. See Brief for Respondent at Appendix A.

147. Comments of Motorola, *supra* note 53, at 3–4, J.App. 152a–153a.

148. See *1978 Memorandum, supra* note 65, 69 F.C.C.2d ¶ 13 at 1558.

149. See text accompanying note 27 *supra*.

try in what it perceived to be a superior technological direction. Its assessment of the beneficial effects achievable with frequency sharing, and its judgment that implementation of the plan was within the technical and economic capability of the RCC industry, were "predictions ... within the institutional competence of the Commission."[150] Our review of the record amassed in this proceeding reveals no warrant for disturbing them.

### B.  *Open Entry and Perpetual Open Entry*

The brunt of Telocator's assault on the Commission's allocation plan is directed at the decision not to restrict access to the new frequencies to RCCs already operating in the affected urban markets. Telocator contends that the Commission is guilty of pursuing competition purely for competition's sake, without making a reasoned determination on whether, in light of the distinctive characteristics of the nonwireline mobile telephone industry, new entry would produce some warrantable benefit to the public. Claiming that existing RCCs would be unable to withstand the economic strain of an influx of new competitors, Telocator asserts that the open entry and perpetual open entry policies are an irrational and unlawful attempt by the Commission to avoid its statutory obligation to resolve, via comparative hearings, the problems precipitated by mutually-exclusive applications.

■  Decisions of the Supreme Court and this court have established beyond peradventure that the Commission may not authorize competitive duplication of communications facilities merely on the assumption that competition is, as a general matter, a good thing.[151] As the cases to which we earlier referred illustrate,[152] however, the Commission may lawfully allow, and indeed encourage, entry of multiple carriers offering overlapping services, if it has reviewed the characteristics of the particular communications field involved and rationally concludes that competition in that field predictably would further the public interest in larger, more economical, and more effective service.[153] Essentially, the Commission must be able reasonably to forecast, first, that new entry will not so severely impair the economic base of existing carriers that the industry would experience an incidence of failure so high as to impair provision of service to the public[154] and, second, that injection of new providers will probably result in better, cheaper, or more innovative communications offerings.[155] These forecasts must have some ascertainable foundation in the record; at the same time, however, conclusions on the future conduct of licensees, the anticipated reaction of investors, the expected course of

**150.** *FCC v. WNCN Listeners Guild, supra* note 107, 450 U.S. at 596, 101 S.Ct. at 1275, 67 L.Ed.2d at 535.

**151.** See, *e.g., FCC v. RCA Communications, supra* note 137; *FCC v. Sanders Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 325–26, 665 F.2d at 1143–1144; *Hawaiian Tel. Co. v. FCC,* 162 U.S.App.D.C. 229, 233–234, 498 F.2d 771, 775–776 (1974); *WLVA, Inc. v. FCC,* 148 U.S.App.D.C. 262, 459 F.2d 1286 (1972); *Carroll Broadcasting Co. v. FCC,* 103 U.S.App.D.C. 346, 258 F.2d 440 (1958).

**152.** See notes 1–6 *supra* and accompanying text.

**153.** See also *FCC v. RCA Communications, supra* note 137, 346 U.S. at 96–97, 73 S.Ct. at 1004–1005, 97 L.Ed. at 1478–1479; *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S. App.D.C. at 325–26, 665 F.2d at 1143–1144;

*RCA Communications v. FCC,* 99 U.S.App.D.C. 163, 238 F.2d 24 (1956) (proceedings on remand), *cert. denied,* 352 U.S. 1004, 77 S.Ct. 563, 1 L.Ed.2d 549 (1957).

**154.** *Carroll Broadcasting Co. v. FCC, supra* note 151, 103 U.S.App.D.C. at 349, 258 F.2d at 443 ("economic injury to an existing station, while not in and of itself a matter of moment, becomes important when on the facts it spells diminution or destruction of service"). Accord, *FCC v. Sanders Radio Station, supra* note 151, 309 U.S. at 476, 60 S.Ct. at 698, 84 L.Ed. at 874–875; *WLVA, Inc. v. FCC, supra* note 151, 148 U.S.App.D.C. at 273, 459 F.2d at 1297.

**155.** See *FCC v. RCA Communications, supra* note 137, 346 U.S. at 97, 73 S.Ct. at 1005, 97 L.Ed. at 1479 ("the Commission must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it").

technological development, and other assumptions about the functioning of tomorrow's communications market are unavoidably exercises in prediction.[156] For such prognoses, we can require only that the agency's decisional memoranda reveal that it identified all relevant issues, gave them thoughtful consideration duly attentive to comments received, and formulated a judgment which rationally accommodates the facts capable of ascertainment and the policies slated for effectuation.

■ Before considering the components of the Commission's decision not to reserve the new frequencies for established RCCs, we must place this determination in context. First, the consequences of a restrictive eligibility rule must be appreciated. Had it disqualified new companies from applying for the reallocated frequencies, the Commission would automatically have foreclosed consideration of whether any of those carriers proposed service superior to that offered by existing carriers. We have in the past expressed concern about policies according preferences to those already in the market,[157] and have reminded the Commission that when it must choose among contenders, its task is to select the one *best* able to serve the public interest.[158] Although we do not go so far as to say that under no circumstances could the Commis-

sion have limited eligibility for the new frequencies to established carriers, we are of the view that such a resolve indubitably would have been harder to sustain. Furthermore, we are cognizant, as Telocator itself points out, that the Commission historically has pursued a policy of open entry in the nonwireline mobile telephone communications field; in other words, there has been no requirement that applicants for unassigned channels already possess authority to operate in that market. Thus, a rule reserving the newly-allocated frequencies for established carriers would have represented a significant departure from prior practice.[159]

Striving for such a limitation, Telocator contended that restricted entry would speed channel assignment by minimizing the number of competing applicants and increase spectral efficiency by giving existing carriers more frequencies with which to create trunked systems.[160] Telocator also claimed that the RCC industry was already highly competitive and that new entry would sound the death knell for the many marginally-viable installations.[161] The Commission's frequency-sharing proposal met the first two concerns, thus isolating the issue of the economic strength of the RCC industry.

---

**156.** *FCC v. WNCN Listeners Guild, supra* note 107, 450 U.S. at 594–596, 101 S.Ct. at 1274–1275, 67 L.Ed.2d at 534–535; *FCC v. RCA Communications, supra* note 137, 346 U.S. at 96–97, 73 S.Ct. at 1005, 97 L.Ed. at 1478–1479.

**157.** See, *e.g., WJG Tel. Co. v. FCC, supra* note 121, 219 U.S.App.D.C. at 372, 675 F.2d at 391; *Central Fla. Enterprises v. FCC,* 683 F.2d 503 (D.C.Cir.1982); *Central Fla. Enterprises v. FCC,* 194 U.S.App.D.C. 118, 598 F.2d 37 (1978), *cert. dismissed sub nom. Cowles Broadcasting v. Central Fla. Enterprises,* 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979); *Citizens Communications Center v. FCC,* 145 U.S.App. D.C. 32, 447 F.2d 1201 (1971).

**158.** See, *e.g., Network Project v. FCC, supra* note 2, 167 U.S.App.D.C. at 227, 511 F.2d at 793; *Citizens Communications Center v. FCC, supra* note 157, 145 U.S.App.D.C. at 37–38, 447 F.2d at 1206–1207; *Johnston Broadcasting Co. v. FCC, supra* note 96, 85 U.S.App.D.C. at 45, 175 F.2d at 356. See also *National Broadcasting Co. v. United States, supra* note 108, 319

U.S. at 216–217, 63 S.Ct. at 1009–1010, 87 L.Ed. at 1363.

**159.** Compare *United States v. FCC, supra* note 2, 209 U.S.App.D.C. at 113–114, 652 F.2d at 106–107. Telocator places great emphasis on the fact that the Commission, in the 1971 notice, announced an intent to restrict the new frequencies to existing carriers. See text accompanying note 23 *supra.* As explained above, this statement was unelaborated by reasons or extended discussion, and the point was clearly a very minor element in the Commission's search for a plan for reallocating frequency space for the entire land mobile communications services. In these circumstances, the 1971 statement hardly represents a deliberate repudiation of past licensing policy.

**160.** See note 28 *supra* and accompanying text.

**161.** See note 29 *supra* and accompanying text.

Looking to Form L data—periodic financial reports required of RCCs—the Commission discovered that from 1970 to 1976 the percentage of RCCs operating at a loss had declined from 39 to 27.7 percent, and that the 1976 loss statistics were significantly better for RCCs than for all miscellaneous common carriers.[162] Moreover, of the approximately 72 percent of RCCs reporting a profit, the average annual net earnings of slightly over $34,000 represented a return of 27.1 percent of book value.[163] From these figures, the Commission felt that the industry as a whole was mature and profitable.[164]

Telocator's denunciation of this finding followed the pattern we have already noted in its responses to other issues: It was vociferous but generalized and unsubstantiated. Telocator reproved the Commission's reliance on Form L data[165] but, despite its status as "the national council of the RCC industry"[166]—a position surely presenting unique opportunities for amassing industry-wide statistics—it adduced no counter-information. Instead, it was content to rest on undocumented assertions that most of the reported profits were derived from paging rather than mobile telephone service, that a 27 percent rate of return was not high because of disproportionately large fixed-plant costs, and that a $34,000 annual profit did not justify assessment of the industry as mature and profitable when the RCCs' main competitor is the "behemoth wireline telephone company."[167]

We have no doubt that some or all of these arguments raised concerns that would have been quite relevant if accompanied by supporting statistics or other documentation. Having chosen not to substantiate its claims, however, Telocator cannot here complain that the Commission continued to stand on facts and figures in its possession. To be sure, an agency has some affirmative obligation to ensure that it has materials sufficient to enable an informed and reasonable decision.[168] But however broad the scope of this inquisitorial duty may be, it clearly does not extend to ferreting out evidence within the grasp of a commenting party merely on that party's claim that such evidence exists and controverts materials already before the agency.[169] In the circumstances, we find that the Commission properly relied upon the Form L data and rationally deduced from those reports that the RCC industry as a whole was financially sound.

This finding sustained, we have no cause for disturbing the Commission's determination that newcomers ought be considered for the reallocated frequencies on the same footing as established carriers. By doubling the number of available frequencies, the Commission significantly enlarged the opportunity for marketing mobile telephone

---

162. See notes 72–73 *supra* and accompanying text.

163. See note 73 *supra* and accompanying text.

164. See text accompanying note 74 *supra*.

165. Part of Telocator's objection seems to be that the Commission "had not relied upon the raw [Form L] data itself" but instead "perform[ed] undisclosed analyses of that data; [took] official notice of the *results* of those analyses; and dr[e]w inferences as to decisional factors on the basis of those results." Brief for Petitioner at 65 (emphasis in original). We are somewhat at a loss to understand this objection. Statistics are of little use without analysis and inferential reasoning. A legitimate part of the Commission's role in such a proceeding is to interpret the data before it. Telocator was on notice that the Commission was looking to Form L statistics, and the kind of analyses the agency did—seemingly just tab-

ulation and averaging—was hardly arcane. Telocator had ample opportunity to join issue on the point with data or analyses of its own. Compare *City of Chicago v. FPC, supra* note 105, 147 U.S.App.D.C. at 328–329, 458 F.2d at 747–748.

166. Brief for Petitioner at 7 n.7.

167. Memorandum to Larry F. Darby, *supra* note 114, at 4, J.App. 205a.

168. See, *e.g., Hall v. FCC,* 99 U.S.App.D.C. 86, 90, 237 F.2d 567, 571 (1956), quoting *Clarksburg Publishing Co. v. FCC,* 96 U.S.App. D.C. 211, 215, 225 F.2d 511, 515 (1955); *WBEN, Inc. v. United States, supra* note 109, 396 F.2d at 613.

169. See generally note 114 *supra*.

service in the major metropolitan areas affected. It believed that new entry carried the potential for operations of higher caliber and lower cost, as well as the impetus for technological advancement.[170] It hypothesized that seeing the newcomer on the horizon would spur existing providers to maintain quality service.[171] We have joined other courts in recognizing that such expectations, when rooted in the agency's informed assessment of the "trends and needs of th[e] industry,"[172] can form valid and reasonable bases for adoption of an open entry policy even though they are necessarily predictions incapable of absolute proof.[173]

Telocator insists, however, that, whatever their general sufficiency, these considerations are inapposite to this case because the technical and economic dynamics of the Commission's frequency-sharing plan render it inevitable that common systems will be formed in most, if not all, the affected markets. Such intensely cooperative arrangements, Telocator reasons, will homogenize all carriers' operations, stifling any potential for distinctive or innovative service, and thus disintegrating the purported justification for open entry. Even assuming the truth of Telocator's premise, we do not believe its conclusion inevitably follows. Choice of the common system method of coordination may indeed standardize the technical operation of all RCCs in the market area and, to the extent that fixed-equipment expenditures constitute a salient portion of expenses, tend to equalize their pricing bases. This does not mean, though, that there can be no variation in cost or quality of service. The talent and efficiency of management, the diligence and cooperativeness of sales and service personnel,

the skill and reliability of repair crews, the volume of business garnered by good performance and effective marketing—all these factors remain within the control of the individual carrier even in a common system, and can noticeably affect the caliber and price of the service the public receives. Thus, even if Telocator's prediction of the eventual dominance of the common system proves true, we cannot say that the Commission's expectations of benefit from new entry are so attenuated or fantastic as to be condemned as irrational.

Having assured ourselves of the reasonableness of the Commission's open entry policy, we move on to consider its perpetual open policy. Analytically, this measure has two components: abolition of any sort of cutoff date for accepting applications from those desiring access to the frequencies, and abrogation of the requirement that applicants individually demonstrate an unmet public need for their services.

Telocator's principal argument against elimination of the cutoff date postulates that without some sense of who their competitors conceivably could be, RCCs and their financial backers will have difficulty in estimating the investment risk of initiating new or expanded operations. This uncertainty, it is claimed, would materially hamper investment in the RCC industry by making credit prohibitively expensive or even completely unavailable. In view of the fact that the only "evidence" submitted on this point was the RCC commentator's expressed concern that it could be a problem, the Commission dismissed the objection as overstated and speculative.[174] We cannot find fault with that response. Although the Commission must pay heed to "[p]rivate losses that result in discourage-

**170.** See, e.g., 1978 Memorandum, supra note 65, 69 F.C.C.2d ¶¶ 31, 44 at 1564, 1567.

**171.** See note 88 supra and accompanying text.

**172.** FCC v. RCA Communications, supra note 137, 346 U.S. at 95, 73 S.Ct. at 1004, 97 L.Ed. at 1478.

**173.** E.g., Western Union Int'l, Inc. v. FCC, supra note 3, 218 U.S.App.D.C. at 151–152, 673 F.2d at 542–543; United States v. FCC, supra note 2, 209 U.S.App.D.C. at 83, 111–114, 652 F.2d at 76, 104–107; RCA Communications v.

FCC, supra note 153, 99 U.S.App.D.C. at 165–166, 238 F.2d at 26–27; Washington Util. & Transp. Comm'n v. FCC, supra note 1, 513 F.2d at 1155–1157. See also Western Union Tel. Co. v. FCC, supra note 4, 211 U.S.App.D.C. at 328–330, 665 F.2d at 1146–1148; Western Union Tel. Co. v. FCC, supra note 4, 214 U.S.App.D.C. at 298–300, 665 F.2d at 1116–1118.

**174.** See notes 77, 85 supra and accompanying text.

ment of investment in quality service," [175] it need not abandon a plan to encourage new entry simply because of an existing carrier's unsubstantiated fears.

Moreover, notwithstanding Telocator's protestations to the contrary,[176] we do not see how the financial forecasts required of an RCC and its investors under the new policy are significantly different from those facing any other enterprise attempting to gauge the competitive environment in order to decide whether its potential market share justifies additional investment. Nor do we understand how they are so very different now from what they were under the Commission's previous policy. As earlier mentioned, the Commission historically has had no restriction on authorizing a new market entrant to use an unoccupied channel.[177] Thus, so long as there remained channels for assignment, there remained the possibility that at some indefinite future time one or more competitors would enter the market. Only when all channels were allocated could an RCC and its investors fully know who would furnish competition, and even then only so long as no competitive shift occurred at the time of license renewal or otherwise.

The other component of the perpetual open entry policy—eradication of the requirement that each license applicant demonstrate a public need for its service—is attacked by Telocator as beyond the Commission's statutory authority. It contends that the "need" showing is part of the "warp and woof" of the standard of "public interest, convenience, and necessity," [178] and that this element must be demonstrated with respect to every applicant. Accepting that identification of public demand for a particular communications service is an integral ingredient of any decision to dedicate scarce spectrum resources to provision of that service, the premise that this identification must proceed on a case-by-case basis is not supported by precedent. The Commission may permissibly undertake in a rulemaking proceeding to assess present and future communications needs and, having crystallized that facet of the public interest by rule, obviate the necessity of reexamining the question in every subsequent licensing decision.[179] Once it descries an unsatisfied public demand for service and recounts the benefits it anticipates from entry of new carriers to help provide that service, the Commission generally is not obliged to do more before deciding to delete the need showing for license applicants.[180]

We say that this is ordinarily the case because we find very troubling one aspect

**175.** *FCC v. National Citizens Comm. for Broadcasting, supra* note 105, 436 U.S. at 805–806 n.24, 98 S.Ct. at 2117 n.24, 56 L.Ed.2d at 721 n.24.

**176.** See Comments, *supra* note 54, at 29, J.App. 127a ("[t]his extraordinary risk and uncertainty does not exist in any other type of business operation, even in the case of freely competitive enterprises").

**177.** See text preceding note 159 *supra.*

**178.** See Comments, *supra* note 54, at 18, J.App. 116a, quoting *Francis v. Southern Pac. Co.,* 333 U.S. 445, 450, 68 S.Ct. 611, 613, 92 L.Ed. 798, 804 (1948) and 47 U.S.C. § 309(a) (1976).

**179.** See, *e.g., Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 300–01, 665 F.2d at 1118–1119; *American Tel. & Tel. Co. v. FCC, supra* note 1, 176 U.S.App.D.C. at 293–296, 539 F.2d at 772–775; *Washington Util. & Transp. Comm'n v. FCC, supra* note 1, 513 F.2d at 1159–1166. See generally *FCC v. National Citizens Comm. for Broadcasting, supra* note 105; *FPC v. Texaco,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *American Airlines v. CAB,* 123 U.S.App.D.C. 310, 359 F.2d 624, *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

**180.** See *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 300–301, 665 F.2d at 1118–1119; *American Tel. & Tel. Co. v. FCC, supra* note 1, 176 U.S.App.D.C. at 295–296, 539 F.2d at 774–775; *Washington Util. & Transp. Comm'n v. FCC, supra* note 1, 513 F.2d at 1159–1166. For the proposition that the ability and willingness of existing carriers to provide a needed service does not require the Commission to exclude new entrants, see also *Western Union Int'l v. FCC, supra* note 3, 218 U.S.App. D.C. at 151–152, 673 F.2d at 542–543 & n.6 and cases therein cited; *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 326, 665 F.2d at 1144.

Thus, Telocator's constant iteration that the need for new service is not the same thing as a

of the Commission's present proposal to eliminate any and 'all consideration of need for additional carriers in proceedings involving access to the 24 new frequencies. Initially, the Commission explained that perpetual open entry would enable the licensing of additional carriers at any time until the channel-block was loaded to capacity with mobile units.[181] Subsequently, however, the Commission espoused a more radical position: It would license new carriers irrespective of whether the channels could accommodate more mobiles.[182] Its rationale for this proposal was that new carriers entering the market in circumstances where the channels were loaded could survive only if they could entice customers away from established carriers by offering some form of superior service. It reasoned that such entry would be in the public interest.[183]

We have accorded substantial deference to the Commission in its judgments about how to maximize both spectral use and quality of service in the new allocations. We think, however, that the Commission comes perilously close here to crossing the line between pursuit of a legitimate regulatory policy using competition to further the public interest and abdication of its regulatory duty. One of the fundamental premises of a regulatory scheme such as that established by the Communications Act is that the free market cannot always be trusted to avoid a wasteful duplication of facilities contrary to the public good.[184] The Commission itself has recognized that injection of competition into a market served by marginally-viable carriers may do the greatest injury to the public's service.[185] Although we have found the evidence before the Commission adequate to support a determination that the RCC industry as a whole can withstand competitive entry, we are aware that the Commission did not undertake a particularized study of the characteristics of each of the thirteen metropolitan areas involved. What can be gleaned from the Form L data suggests that these markets differ considerably in the number of carriers already in operation and in the profitability of their enterprises.[186] Admission of each new carrier into an area where the frequencies can no longer accept new mobile units necessarily means carving one

---

need for new service *providers,* while correct in theory, in reality misses the point. It is not the Commission's finding of public demand for additional mobile telephone service *per se* that justifies its open entry policy. Rather, it is this finding in conjunction with the determination that competition is feasible and will be beneficial—that is, that the advent of additional carriers would not precipitate a disruptive failure rate, and that some positive impact on the quality, cost, or variety of service predictably will attend their arrival—that enables institution of an open entry policy.

**181.** See text accompanying note 51 *supra.*

**182.** See note 89 *supra* and accompanying text.

**183.** See notes 86–88 *supra* and accompanying text.

**184.** *FCC v. RCA Communications, supra* note 137, 346 U.S. at 93, 73 S.Ct. at 1003, 97 L.Ed.2d at 1477; *Hawaiian Tel. Co. v. FCC, supra* note 151, 162 U.S.App.D.C. at 235, 498 F.2d at 777.

**185.** See text accompanying note 27 *supra.*

**186.** For example, the data for Pittsburgh, the city having fewest carriers, showed five out of five licensees reporting a profit, with the average rate of return being 20.4%. By contrast, Detroit and Cleveland, which had the next lowest number of carriers, each showed six out of nine carriers—66%—reporting losses. Philadelphia, with 15 carriers, reported a mere 6% loss rate, but the average rate of return was only 13.9%, while Los Angeles, having 16 carriers, showed 25% of its carriers reporting losses, but an average profit of 27.5% for the remaining 75%. See *1978 Memorandum, supra* note 65, 69 F.C.C.2d at 1563 (table). The Commission itself remarked upon the diversity of the urban markets here involved and refused to adopt a standardized technical coordination plan precisely because the characteristics of these markets varied widely. *See, e.g.,* note 44 *supra;* text accompanying note 67 *supra.*

The Commission was inclined to discount somewhat the loss statistics contained in the Form L reports on the theory that some fiscally-solid RCCs might be showing accounting losses for tax purposes. It based this theory on its determination that "of the call signs which reported losses . . ., on the average, the call signs had been in existence for seven years. . . . Firms losing money and still remaining in business for any considerable period of time are a paradox." *1978 Memorandum, supra* note 65, 69 F.C.C.2d ¶ 30 at 1564. Although the Commission of course is justified in attempting to ensure that its assessments of the economic

more slice out of a fixed customer pie. In markets where the RCCs are thriving, or where the public's choice of service is confined to one or a very few carriers, entry of another carrier after the point of technical saturation may do no harm to the financial stability of the local RCC industry that is not outweighed by the benefits of a fresh and aggressive competitor.[187] In markets where the industry is foundering, or where the public already may select from among a plethora of carriers, however, new entry after saturation may siphon off enough customers to undermine the economic base of existing carriers without any appreciable increment in the quality of service offered to the public.[188]

We are concerned, therefore, that the Commission's announced intention to license additional carriers even where the channel-loading limits have been reached may augur more harm than good if implemented indiscriminately in all market conditions. We do not think this potential justifies invalidating the entire perpetual open entry policy;[189] we do, however, sound the warning that in applying that policy to authorize additional carrier access to already saturated frequencies, the Commission must be sensitive to the dynamics of the particular market. "Competitors may severely injure each other to the great benefit of the public,"[190] but the Commission, in its zeal to ensure that mobile telephone users partake of this benefit, may not forget that furtherance of the public interest has been entrusted to its hands, not left to the forces of the market. For the moment at least, we are satisfied in the expectation that the Commission will impose entry controls if confronted with a proper showing that an influx of additional carriers in a specific technically-saturated market predictably would result in ruinously undermining the local RCC industry.[191]

## C. The Plurality Method of Selecting Technical Coordination

Finally, Telocator complains that the plurality scheme for selecting among

---

health of the industry are not skewed by paper losses, we feel constrained to point out that the 1976 Form L data did not reveal the profit history of the reporting companies *over time*. Thus, there is no warrant for concluding from these data that older firms which reported a loss in 1976 have been doing so for several past years. The data could as well indicate that these established, previously successful firms were beginning to have difficulty.

**187.** *Cf. Western Union Int'l v. FCC, supra* note 3, 218 U.S.App.D.C. at 152, 673 F.2d at 543 (sustaining the Commission's conclusion that benefits of new entry would outweigh "any loss of traffic or revenues" by existing carriers, who were deemed able to withstand competition).

**188.** *Cf. FCC v. Sanders Radio Station, supra* note 151, 309 U.S. at 476, 60 S.Ct. at 698, 84 L.Ed. at 874–875 (additional entry may mean "that both stations—the existing and the proposed—will go under, with the result that a portion of the listening public will be left without adequate service; it may indicate that, by a division of the field, both stations will be compelled to render inadequate service").

**189.** Compare *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 327–329, 665 F.2d at 1145–1147 (city-by-city and carrier-by-carrier analysis not necessary to support rulemaking inquiry into competitive circumstances of industry as a whole).

**190.** *Carroll Broadcasting Co. v. FCC, supra* note 151, 103 U.S.App.D.C. at 349, 258 F.2d at 443.

**191.** The Commission has an ongoing obligation to monitor its regulatory programs and make adjustments in light of actual experience. *National Ass'n of Regulatory Util. Comm'rs v. FCC, supra* note 6, 173 U.S.App.D.C. at 421, 525 F.2d at 638; *American Airlines v. CAB, supra* note 179, 123 U.S.App.D.C. at 319, 359 F.2d at 633; *National Ass'n of Theatre Owners v. FCC,* 136 U.S.App.D.C. 352, 361, 420 F.2d 194, 203 (1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970). This duty to finetune its regulatory approach as more information becomes available is necessarily the price of leeway the courts accord the Commission to pursue plans and policies bottomed on informed prediction. *E.g., National Ass'n of Regulatory Util. Comm'rs v. FCC, supra* note 6, 173 U.S.App.D.C. at 421–422, 525 F.2d at 638–639; *Network Project v. FCC, supra* note 2, 167 U.S.App.D.C. at 230–231, 511 F.2d at 796–797. While the Commission "need not re-study the entire problem de novo and reconsider policy every time it receives an application for waiver of the rule," *WAIT Radio v. FCC, supra* note 105, 135 U.S.App.D.C. at 320, 418 F.2d at 1157, it cannot blind itself to the exigencies of the truly exceptional case.

the various technical coordination methods impermissibly deprives license applicants of the hearing to which they are entitled under Section 309(e) [192] when resolution of mutually exclusive applications turns on material factual questions. The Commission's response to this contention was twofold. It asserted that the plurality scheme did not actually result in a choice among applicants; rather, it said, the plan was merely a means whereby technical qualifications for the particular market would be established.[193] Beyond that, the Commission advanced its view that differences among the possible modes of technical coordination were so insignificant in terms of their ability to serve the public interest that any questions about which method was most appropriate in a given market were not sufficiently "material" to trigger Section 309(e)'s hearing requirement.[194] We consider these responses somewhat problematic. We do not find it necessary decisively to rule on their legitimacy, however, for we are satisfied that the Commission is proceeding by an alternative procedure that is both authorized and appropriate.

It is well-settled that the Commission may elect to utilize its rulemaking power [195] in lieu of adjudication when the pertinent issues involve legislative rather than adjudicative facts,[196] and have prospective effect and classwide applicability.[197] When these conditions are present, "rule making is not transformed into adjudication merely because the rule adopted may be determinative of specific situations arising in the future." [198] We have approved the Commission's resort to rulemaking even when the affected class was quite small.[199]

As the procedure is now codified in its regulations, the Commission, at the end of a 60-day coordination period in each market, notices for public comment the technical coordination plan that has received the greatest support among the license applicants.[200] After all interested persons have had an opportunity to express their views, the Common Carrier Bureau examines the plan in light of the comments to determine

---

**192.** 47 U.S.C. § 309(e) (1976).

**193.** See text accompanying note 95 *supra.*

**194.** See text accompanying note 96 *supra.*

**195.** See 47 U.S.C. § 303(r) (1976); *FCC v. National Citizens Comm. for Broadcasting, supra* note 105, 436 U.S. at 793, 98 S.Ct. at 2111, 56 L.Ed.2d at 713; *WBEN, Inc. v. United States, supra* note 109, 396 F.2d at 617–618.

**196.** "The object of the rule making proceeding is the implementation or prescription of law or policy for the future, rather than the evaluation of a respondent's past conduct. Typically, the issues relate not to the evidentiary facts, as to which the veracity and demeanor of witnesses would often be important, but rather to the policymaking conclusions to be drawn from the facts. Conversely, adjudication is concerned with the determination of past and present rights and liabilities." *American Airlines, Inc. v. CAB, supra* note 179, 123 U.S.App.D.C. at 315, 359 F.2d at 629, quoting Attorney General's Manual on the Administrative Procedures Act (1947) (citation omitted). On the difference between legislative and adjudicative facts, see 2 K. Davis, Administrative Law Treatise, § 12:3 at 413 (2d ed. 1979).

**197.** *FCC v. National Citizens Comm. for Broadcasting, supra* note 105, 436 U.S. at 793, 98 S.Ct. at 2111, 56 L.Ed.2d at 713; *United States*

*v. Storer Broadcasting Co., supra* note 179, 351 U.S. at 202–205, 76 S.Ct. at 770–771, 100 L.Ed. at 1090–1092; *Western Union Tel. Co. v. FCC, supra* note 4, 214 U.S.App.D.C. at 300–301, 665 F.2d at 1118–1119; *American Tel. & Tel. Co. v. FCC, supra* note 1, 176 U.S.App.D.C. at 295–296, 539 F.2d at 774–775; *WBEN, Inc. v. United States, supra* note 109, 396 F.2d at 617–618; *Washington Util. & Transp. Comm'n v. FCC, supra* note 1, 513 F.2d at 1160–1165. See generally *United States v. Florida E. C. Ry.,* 410 U.S. 224, 244–245, 93 S.Ct. 810, 820–821, 35 L.Ed.2d 223, 238–239 (1973); *American Airlines, Inc. v. CAB, supra* note 179, 123 U.S.App. D.C. at 315–319, 359 F.2d at 629–633.

**198.** *Logansport Broadcasting Corp. v. United States,* 93 U.S.App.D.C. 342, 345, 210 F.2d 24, 27 (1954).

**199.** *E.g., Transcontinent Television Corp. v. FCC,* 113 U.S.App.D.C. 384, 308 F.2d 339 (1962) (television channels in one city). See also *Goodwill Stations, Inc. v. FCC,* 117 U.S. App.D.C. 64, 325 F.2d 637 (1963); *Logansport Broadcasting Corp. v. United States, supra* note 198. The Administrative Procedure Act defines a rule as a "statement of general or *particular* applicability and future effect . . . ." 5 U.S.C. § 551(4) (1976) (emphasis added).

**200.** See 47 C.F.R. § 22.501(1)(9)(iii)–(iv) (1981).

whether it serves the public interest, convenience and necessity and otherwise conforms with the Communications Act. If the plan withstands this scrutiny, it becomes the governing technical standard for that particular market, and applicants are given a chance to conform their proposals to that plan. In essence, then, the Commission is proceeding by a series of small informal rulemakings to fix the mode of technical coordination in each of the affected metropolitan areas.[201] The pertinent factual issues—which technical method can most effectively, economically, and expeditiously be employed by prospective carriers to utilize the new frequencies—are thoroughly appropriate for resolution by rulemaking. The Commission's use of the plurality method to select which technical coordination scheme will be noticed for comment is unexceptionable. Solution of the coordination question must begin by focus on some particular plan, and the Commission's decision to start with the method favored by the greatest number of applicants strikes us as eminently reasonable.

Accordingly, we reject Telocator's challenge to the means whereby a technical coordination scheme is picked for each market. Predictably, the rulemaking process in which the Commission engages will resolve substantially all material factual questions on the point, as well as illuminate the pertinent considerations that must inform a determination on whether the plurality plan serves the public interest, convenience, and necessity. The propriety of this procedure is not eroded by the Commission's candid admission that it embarked on this course in an effort to avoid numerous Section 309(e) hearings. So long as the Commission remains within the bounds of its statutory authority, it may pursue a procedural route it deems superior to one it fears will be unduly time-consuming or burdensome.[202]

In conclusion, then, we sustain the Commission's plan for allocating the 24 new channels to nonwireline mobile telephone service. Our only reservation emanates from the Commission's decision to continue to license applicants even in markets incapable of accommodating new mobiles. We will not disturb the Commission's general statement on the point, but we caution it to take special care not to abdicate its responsibility to prevent ruinous competition in particular markets as well as in the industry as a whole. In dedicating these channels to shared use and lowering the regulatory barriers to competitive entry, the Commission has elected an innovative and perhaps unique approach to the provision of land mobile communications. We do not purport to endorse the wisdom of this course, for that is not our office. Ultimately, "it is the Commission, not the courts, which must be satisfied that the public interest will be served."[203] We determine only that the Commission's approach is reasonably calculated to accommodate goals within its province to establish.

*Affirmed.*

**201.** We have identified the essence of informal rulemaking as "publication of notice of the subject or issues involved, an opportunity for interested parties to participate through submission of written data, and the right to petition in respect of rules." *American Airlines v. CAB, supra* note 179, 123 U.S.App.D.C. at 315, 359 F.2d at 629.

**202.** *United States v. FCC, supra* note 2, 209 U.S.App.D.C. at 103, 652 F.2d at 96; *WLVA, Inc. v. FCC, supra* note 142, 148 U.S.App.D.C. at 280, 459 F.2d at 1304; *WBEN, Inc. v. United States, supra* note 109, 396 F.2d at 617–618. See also *Permian Basin Area Rate Cases,* 390 U.S. 747, 777, 88 S.Ct. 1344, 1365, 20 L.Ed.2d 312, 342 (1968). See generally *FCC v. National Citizens Comm. for Broadcasting, supra* note 105, 436 U.S. at 808 n.29, 98 S.Ct. at 2119 n.29, 56 L.Ed.2d at 723 n.29; *City of Chicago v. FPC, supra* note 105, 147 U.S.App.D.C. at 323, 458 F.2d at 742; *GTE Serv. Corp. v. FCC,* 474 F.2d 724, 731 (2d Cir. 1973); *General Tel. Co. v. United States, supra* note 108, 449 F.2d at 863 n.15. See also 47 U.S.C. § 154(j) (1976).

**203.** *Greater Boston Television Corp. v. FCC, supra* note 105, 143 U.S.App.D.C. at 405, 444 F.2d at 863, quoting *FCC v. WOKO, Inc.,* 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204, 208 (1946).