PEOPLE of the STATE OF
CALIFORNIA, et al.,
Petitioners,

New York Telephone Company and New
England Telephone Companies (The
"Nynex Telephone Companies"), et al.,
Intervenors,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, et al., and United States
of America, Respondents.

MCI TELECOMMUNICATIONS
CORPORATION, Petitioner,

National Telephone Cooperative
Association, Intervenor,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Respondents.

PEOPLE of the STATE OF CALIFOR-
NIA, Public Utilities Commission of the
State of California, Petitioners,

Pacific Bell & Nevada Bell, et al.,
Petitioners–Intervenors,

Coalition of Open Network Architecture
Parties ("CONAP"), Intervenor,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, et al., United States of
America, Respondents,

Ameritech Operating Companies, (Illinois
Bell Telephone Co., Indiana Bell Tele-
phone Co. Incorp., Michigan Bell Tele-
phone Co., Ohio Bell Telephone Co.,
Wisconsin Bell, Inc.), et al., Respon-
dents–Intervenors.

MCI COMMUNICATIONS
CORPORATION,
Petitioner,

The National Association of Regulatory
Utility Commissioners, et al.,
Intervenors,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Respondent.

Nos. 91–70336, 91–70040, 91–
70164 and 91–70302.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1993.

Decided Sept. 23, 1993.

**1506**

Mark Fogelman, California Public Utilities Com'n, San Francisco, CA, for petitioners.

Frank W. Krogh, MCI Telecommunications Corp., Washington, DC, for petitioners MCI.

John E. Ingle, F.C.C., Washington, DC, for respondent FCC.

Michael K. Kellogg, Mayer, Brown & Platt, Washington, DC, for intervenors in support of the respondents in the California cases.

J. Roger Wollenberg, Wilmer, Cutler & Pickering, Washington, DC, for intervenors in support of respondents in the MCI cases.

Before: SCHROEDER and BRUNETTI, Circuit Judges, and KING,* District Judge.

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

1. The orders under review are: Memorandum Opinion and Order, *Filing and Review of Open Network Architecture Plans*, Phase I, FCC 88–381, 4 F.C.C.R. 1 (1988) (*BOC ONA Order*); Memorandum Opinion and Order on Reconsideration, *Filing and Review of Open Network Architecture Plans*, Phase I, FCC 90–134, 5 F.C.C.R. 3084 (1990) (*ONA Reconsideration Order*); Memorandum Opinion and Order, *Filing and Review of Open Network Architecture Plans*, Phase I, FCC 90–135, 5 F.C.C.R. 3103 (1990) (*BOC ONA*

*Amendments Order*); and Report and Order, *Computer III Remand Proceedings*, FCC 90–415, 5 F.C.C.R. 7719 (1990) (*ONA Remand Order*).

2. The following parties are intervenors in support of MCI: Alarm Industry Communications Committee, Independent Data Communications Manufacturers Association, Inc., Information Technology Association of America, Maryland People's Counsel, Newspaper Association of America, North American Telecommunications Association, and U.S. Sprint Communications Company Limited Partnership.

SCHROEDER, Circuit Judge:

## OVERVIEW

MCI Corporation and the State of California petition for review of four FCC orders approving access arrangements, known as Open Network Architecture (ONA), to the telephone transmission network.[1] MCI and the numerous supporting intervenors[2] (collectively referred to as MCI), are all competitors of the Bell Operating Companies (BOCs) in providing "enhanced services" to telephone customers based on rapidly expanding computer technology. They are concerned about gaining equal access to the telephone communications network, controlled by the BOCs as regulated regional monopolies, in the aftermath of the break up of AT & T.

MCI is concerned that the orders do not provide sufficient protection from the BOCs' possible discrimination against competitors in the face of impending elimination of the structural separation of the BOCs' basic telephone services from their own enhanced telecommunications services. MCI contends that the FCC, by approving these orders, has violated the Administrative Procedure Act both by departing without adequate explanation from prior policy and by refusing to consider evidence of the inadequacy of ONA, as adopted, to prevent discrimination.

The FCC defends the orders on the ground that there has been no unexplained substantive departure from previously approved ONA concepts which were always viewed as evolutionary. We hold that these orders do not in and of themselves violate the APA because the FCC has not implemented any significant, unexplained departure from prior ONA policy. We emphasize that we do

not consider any issue as to whether ONA, as adopted in these orders, adequately safeguards against discrimination in the event of structural separation.

In the California petitions, the State of California and the Public Utilities Commission, also supported by intervenors [3] seek review of those aspects of the orders that require federal tariffing of certain services the BOCs offer to the enhanced service providers. The FCC ordered federal tariffs of services that are technically compatible with interstate use. California contends that the federal tariff provision violates section 2(b)(1) of the Fed.Com.Act, 47 U.S.C. § 152(b)(1)(2), because the FCC lacks jurisdiction to regulate services which are used only in connection with intrastate service, regardless of whether such services are technically compatible with interstate use. We hold that the orders under review establish a federal tariff for potential interstate services and do not regulate intrastate communications.

We recognize the states' concern that, because the states' rates for intrastate services offset other costs, state rates will be higher than federal tariffs, and customers may attempt to use the federal tariff for intrastate as well as interstate communications. The potential problem of tariff shopping, however, cannot deprive the FCC of jurisdiction to regulate services based on potential interstate use. If the tariff is not established until after interstate use becomes a reality, the practical effect will be the imposition of the higher, state regulated intrastate rates to those interstate services within the jurisdiction of the FCC under Federal law.

We therefore deny the petitions for review.

## I. The MCI Petition

### Background

Much of the background of these controversies and explanation of the concepts involved is contained in California v. FCC

(California I), 905 F.2d 1217 (9th Cir.1990). There we reviewed the FCC's comprehensive proceeding known as Computer III [4] in which the FCC determined that the regional BOCs would no longer have to maintain corporate, structural separation between their common carrier, regulated, basic service operations and their provision of unregulated, enhanced services. In California I, we granted review and remanded, holding that "the FCC's substitution of nonstructural safeguards for the federal structural separation requirements to which the BOCs were subject was unlawfully arbitrary and capricious." Id. at 1246. Three of the orders before us in this proceeding were issued after Computer III but before our decision in California I. The fourth order under review was issued after California I and reaffirmed the three prior orders.

Following issuance of all four of these orders, the FCC issued a new order approving the lifting of structural separation. MCI's petition for review of that order has been filed in this court but was not briefed at the time that this matter was heard. That order is not before us.

We here briefly summarize the history of this litigation as explained in California I.

In the 1960s, a new industry based upon the rapidly advancing technology of the telephone and the computer began to develop. The key services, "enhanced services," depended on the use of existing telephone transmission facilities to reach their customers. Examples of these types of services include "[d]atabase services, in which a customer dials a number to obtain access to stored information, such as Dow Jones News, Lexis, and 'Dial It' sports scores." See California I, 905 F.2d at 1233 n. 3. The sole access to these transmission facilities was and continues to be controlled by regulated telephone monopolies, the divested Bell Operating Companies. Because of this depen-

---

**3.** The following parties are intervenors in support of California: Pacific Bell, Nevada Bell, District of Columbia Public Service Commission, Florida Public Service Commission, Iowa Utilities Board, Maryland People's Counsel, and National Association of Regulatory Utility Commissioners.

**4.** Report and Order, *Amendment of Section 64.-702 of the Commission's Rules and Regulations*, Phase I, FCC 86–252, 104 F.C.C.2d 958 (1986) (*Computer III* ).

dence, the Federal Communications Commission faced new regulatory problems in ensuring that the enhanced service industry could develop and stay competitive against regulated monopoly telephone carriers who were eager to get into the enhanced services market themselves. Specifically, the FCC was concerned that (1) monopoly carriers would gain an unfair competitive edge in the enhanced service industry by discriminating in favor of their own enhanced services when providing access to the telephone transmission facilities, and (2) that carriers would exploit their monopolies over the telephone industry by cross-subsidization: passing on the costs of their enhanced services to regular telephone ratepayers who are required to use the carriers because of their monopoly over local phone services.

In order to deal with these two problems, the FCC, in its first two computer inquiries [5] (*Computer I & Computer II*), required regulated monopoly telephone carriers offering enhanced services to form separate corporate subsidiaries. This "structural separation" was to be the principal means of preventing cross-subsidization and discriminatory access. Through subsequent regulatory and legal developments, including the divestiture of AT & T from the Bell Operating Companies, the structural separation requirement was held to be applicable only to the BOCs. This was the result of the FCC's findings that the post-divestiture BOCs continued to hold monopoly power over access to telecommunications transmission facilities.

The structural separation requirement imposed by *Computer II* forced the BOCs to produce and market enhanced services independent of their basic telephone services. Accordingly, the BOCs' enhanced service subsidiaries were required to maintain different accounting records, different staffs, and different equipment premises. The FCC determined that this structural separation would make it difficult for the BOCs to cross-subsidize and that it would reduce the chance of access discrimination by putting the BOCs' enhanced service subsidiaries on equal footing with their competitors when seeking transmission services.

In 1985, in the FCC's third computer inquiry (*Computer III*), the FCC reversed its previous course and announced its intention to relieve the BOCs of the structural separation requirement. The FCC reasoned that the BOCs' divestiture from AT & T and increased market competition had diminished the value of structural separation as a safeguard against monopoly abuse. Moreover, the FCC concluded that the costs of structural separation exceeded its public benefits. Nevertheless, because the FCC found that the BOCs continued to have monopoly power over access to the telephone transmission facilities, the FCC proposed to replace the structural separation requirements with non-structural regulations.

These regulations consisted of two primary safeguards. First, the FCC would develop accounting methods to minimize the BOCs' ability to shift costs of their enhanced services to their telephone ratepaying customers. Second, the FCC would promulgate policies designed to prohibit "the BOCs from using their substantial market power in providing network access to discriminate against competing providers of enhanced services."

To achieve this second objective, the FCC, in *Computer III* articulated an "open-network" policy that required the BOCs to make access to telephone transmission facilities as available to competitors as they were to the BOCs themselves. This open-network policy was premised on the development of "Open Network Architecture" (ONA). *Computer III*, 104 F.C.C.2d at 1063.

The key principle of ONA, as articulated in *Computer III,* was that BOCs would "unbundle" basic "interconnection arrangements" in the telecommunications network and provide competitors with the transportation ability to access and use these arrangements without hinderance from the BOCs. *Id.* at 1063–65. The FCC defined these new "interconnection arrangements" as Basic Service Elements

---

**5.** Final Decision and Order, In re Regulatory and Policy Problems Presented by the Interdependence of Computer and Communication Services and Facilities, 28 F.C.C.2d 267 (1971); Final Decision, In re Amendment of Section 64.702 of the Commission's Rules and Regulations, 77 F.C.C.2d 384 (1980).

(BSEs). *Id.* at 1064. It envisioned that enhanced services providers (ESPs) would be able to purchase specific BSEs on a tariffed basis, and compile different types of enhanced services. *Id.* Pursuant to this open network architecture policy, the FCC ordered the BOCs to submit ONA plans containing an initial set of unbundled BSEs to the FCC by February 1, 1988. *Id.* at 1067. While the BOCs' submission of those plans was pending, a petition for review of *Computer III* was filed with this court. *See California I,* 905 F.2d 1217.

In *California I,* we reviewed the FCC's decision to lift the structural separation requirement. In deciding whether the FCC had provided a reasoned analysis for its action, we concluded that the FCC had made a "plausible case" that competitive forces coupled with technological advances available for use in ONA offered sufficient safeguards against discrimination once the structural separation requirement was lifted. *Id.* at 1233. We also found, however, that the FCC had not adequately justified its finding that the risk of cross-subsidization had been reduced sufficiently to permit it to relax the structural separation requirement. *Id.* at 1239. We therefore vacated the orders on review, and remanded the case to the FCC for further proceedings consistent with the court's decision. *Id.* at 1246.

Subsequent to our remand, the FCC reinstated sections of the vacated *Computer III* orders which involved ONA implementation. *ONA Remand Order,* 5 F.C.C.R. at 7719. In doing so, the FCC conditionally approved ONA plans which had been submitted by the BOCs after *Computer III* but before our decision in *California I.* These plans define the technological scope of the ONA program. In this appeal, petitioners challenge the FCC's orders granting conditional approval of the ONA plans.

*Computer III: ONA Standards*

In order to determine whether the approval of the ONA plans under review here changed *Computer III,* we must first understand *Computer III* as it applied to the development of ONA. *Computer III* required the BOCs to develop plans for ONA that provided for advanced technology and the unbundling of basic telephone network services. The goal of ONA as articulated in *Computer III* was to make access to the telephone transmission facilities as available to ESPs as it was to the BOCs themselves. In defining the specific technical standards that the BOCs were to follow in developing the ONA plans, the FCC specified that BOCs "must provide unbundled service 'building blocks' (Basic Service Elements) to [BOC] competitors." *Computer III,* 104 F.C.C.2d at 1064. The unbundling of BSEs would allow ESP competitors to purchase, on a tariffed basis, only those elements that were necessary to that carrier's specific type of enhanced service. The FCC further specified that "[a]ll basic network capabilities that would be useful in enhanced service applications, 'including signalling, switching, billing and network management,' would be subject to the unbundling requirement." *Id.* at 1040. To avoid inefficiencies resulting from unnecessarily unbundled services, the FCC directed the BOCs to collaborate with the enhanced services industry to develop plans that (1) were justified by "expected market demand," (2) had "utility as perceived by enhanced services competitors," and (3) were technically and economically feasible. *Id.* at 1065. Upon approval of these plans and conditioned on compliance with several other requirements, the FCC stated that it would lift the structural separation restraints on the BOCs. *Id.* at 1067.

*Summary of the Four ONA Orders Under Review*

a. First ONA Plans: *BOC ONA Order*

In the *BOC ONA Order,* the FCC conditionally approved, over the objections of MCI and other ESPs, the first set of BOC ONA plans. *BOC ONA Order,* 4 F.C.C.R. at 10. These initial plans divided ONA into three categories: Basic Serving Arrangements (BSAs), Basic Service Elements (BSEs), and Complementary Network Services (CNSs). *Id.* Under the submitted ONA model, BSAs were "the fundamental tariffed switching and transport services that allowed an ESP to communicate through the BOC network." *Id.* The purchase of some form of BSA was necessary for an ESP or its customer to gain

access·to optional unbundled features, classified as BSEs. *Id.* CNSs were optional unbundled basic service features that "end users" could ·obtain in order to receive an enhanced service. *Id.*

Upon reviewing the plans, the FCC found that the BSA/BSE model was premised largely on existing network services rather than new network technologies. *Id.* at 41–42; 168–69; 176; 196–202. The FCC nevertheless found that the plans were a "useful first step in implementing the ONA." *Id.* at 66. The FCC determined the "BSA/BSE" proposal recognized "the realities of the current [network architecture]" and that it was "more likely to bring new features to ESPs at a faster rate, and with less investment, than could a radical reconfiguration" of the transmission network. *Id.* at 42.

In response to criticism that the plans did not sufficiently unbundle the BSEs as had been envisioned in *Computer III,* the FCC stated that it did not require "fundamental unbundling ... at this time." *Id.* The FCC concluded that the benefits of ONA were to be long-term goals that were to be developed and implemented after the BOCs were freed from structural requirements. *Id.* at 200. Emphasizing these "long-term" goals, the FCC directed the BOCs to amend the initial ONA plans to describe how ONA would evolve in light of new technological developments. *Id.* at 201–02.

b. *ONA Reconsideration Order*

In 1989, after the first ONA plans were conditionally approved by the FCC, the petitioners sought reconsideration of the plans on the basis that the FCC's approval of the plans significantly changed the requirements established in *Computer III.* Petition for Reconsideration of MCI Telecommunications Corporation (filed Feb. 24, 1989). Specifically, the petitioners maintained that *Computer III* required implementation of (1) new technology and (2) fundamental unbundling prior to the elimination of the structural separation requirement. *Id.* The FCC denied the petition for reconsideration, stating that *Computer III* policies were never intended to dictate a "flash cut" to new technologies or configurations, but rather the *Computer III*

technology was to be evolutionary and that further unbundling remained an important "long term objective." *ONA Reconsideration Order,* 5 F.C.C.R. at 3085.

·c. *Amended ONA Plans*

In 1990, the FCC substantially approved the Amended ONA plans submitted by the BOCs, subject to further modification, and established procedures for long-term oversight of the ONA "process." *BOC ONA Amendments Order,* 5 F.C.C.R. at 3104. The FCC found that the Amended ONA plans proposed to offer approximately 60% of those services that the ESPs originally had requested. *Id.* at 3122. Nevertheless, the FCC still found that the Amended ONA plans contained "limited information on how future technologies ... will be made available to ESPs." *Id.* at 3116. The FCC stated that it "shared the disappointments of those who had hoped that advanced technologies could be developed and implemented more quickly," but accepted the BOCs' justification that the requested services were not, at that point, technically feasible. *Id.* at 3109, 3116. The FCC concluded that the Amended ONA plans contained sufficient near-term protections to prevent the BOCs from discriminating against their competitors, but again directed the BOCs to file new Amended ONA plans which would set forth, in greater detail, specific plans for developing and implementing new network technologies. *Id.* at 3116.

d. · *ONA Remand Order*

Following the ·remand order by the court in *California I,* the FCC, in 1990, initiated its Computer III Remand Proceedings, and reaffirmed the previous ONA policies developed in *Computer III* and in the three subsequent orders approving the various ONA plans. *ONA Remand Order,* 5 F.C.C.R. at 7719. MCI filed a petition for review of all four orders.

*Analysis*

MCI and the intervenors in support of MCI contend that the FCC, in approving the ONA plans, significantly altered, without reasoned justification, the scope and purpose of

ONA as articulated in *Computer III.* They assert that this change dilutes the technical and regulatory standards that justified the FCC's decision to lift structural separation. The FCC denies any change in its policies. It contends that *Computer III* did not impose strict technological standards as a precondition to the lifting of structural separation. Rather, FCC maintains that the purpose of *Computer III* was to provide the groundwork for what was to be a developing and evolutionary technological process. The FCC contends that the petitioners misinterpret both the technical standards and the implementation schedule that was articulated in *Computer III.*

■ Section 10(e) of the Administrative Procedure Act (APA) requires a reviewing court to "determine whether the FCC's decision was a reasonable exercise of its discretion, based on consideration of relevant factors, and supported by the record." *California I,* 905 F.2d at 1230 (citing 5 U.S.C. § 706(2)(A)). The scope of judicial review under this standard is narrow and an agency's interpretation of its own policies and prior orders is entitled to deference. *Id.* Nevertheless, although the standard of review is deferential, it may not be uncritical. *Id.* A reviewing court, therefore, may require the agency to provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43–44, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (*State Farm*); *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1425 (D.C.Cir.1983). Moreover, if the record reveals that the agency has "failed to consider important aspects of a problem" or has "offered an explanation for its decision that runs counter to the evidence before it," the court must find the agency in violation of the APA. *California I,* 905 F.2d at 1230 (quoting *State Farm*).

The issues we must decide are therefore first, whether the ONA plans approved by the FCC constitute a new policy and, if so, whether this new policy was reasonably explained and justified.

MCI's position is that the four orders under review represent a change in prior policy because the FCC failed to explain its change from requiring complete unbundling of basic services as part of the initial ONA plans, to a policy of approving plans with only partial unbundling. The FCC responds that there has never been a policy change, that complete, fully open and unbundled ONA was always an evolutionary concept.

■ Both sides overstate their cases. The FCC maintains there was no change in policy from *Computer III* and that it always viewed ONA as a long-term, evolutionary objective. This is not supported by the record.

*Computer III* established "Comparably Efficient Interconnection" (CEI) plans as a companion to ONA in order to permit the BOCs to provide integrated enhanced services before approval and implementation of ONA. Accordingly, CEI plans were to offer ESPs interconnections to the BOCs' networks that were substantially equivalent to the interconnections that the BOCs provided for their own enhanced services. By contrast, ONA was to apply much more broadly to the BOCs' networks regardless of which enhanced services the BOCs themselves might choose to offer. The BOCs were directed to incorporate basic CEI concepts into the overall design of ONA. *See Computer III,* 104 F.C.C.2d at 1039, 1053; *California I,* 905 F.2d at 1229 n. 20.

In *Computer III,* the FCC quite clearly set forth its view, as of that time, that the near future held ONA and fundamental unbundling technology sufficient to eliminate the need for CEI reports. There the FCC said in a relevant portion of *Computer III:*

While we acknowledge the potential value of Open Network Architecture as a nonstructural safeguard to replace the burdensome structural separation requirements for enhanced services, we also recognize that the architectural implementations described in the comments are merely general proposals that do not fully address our regulatory concerns. Accordingly, we do not adopt or approve any of the commenters' network architecture proposals at this time. Rather, we specify cer-

tain standards that a carriers' Open Network Architecture Plans must meet. Upon our approval of such a Plan, a carrier will no longer be required to file a CEI Plan for each enhanced service that it offers. We have developed the Open Network Architecture requirements based on the extensive record before us. By adopting general requirements rather than mandating a particular architectural implementation, we wish to encourage development of the most efficient interconnection arrangements possible that will satisfy our regulatory goals.

.      .      .      .      .

On or before February 1, 1988, AT & T and the BOCs must file Open Network Architecture Plans with the Bureau that describe their compliance with the foregoing requirements and list their initial set of Basic Service Elements. Our approval of each carrier's Plan is a precondition to the removal of structural separation for that carrier's enhanced service operations. Prior to such approval, we shall request and evaluate public comment on the Plans. After implementation of an approved Open Network Architecture Plan and the carrier's satisfaction of our cost allocation and other safeguards, the structural separation requirements will no longer apply to the carrier's enhanced services operations, and it will not be required to file a service-specific CEI plan prior to offering a new enhanced service.

*Computer III*, 104 F.C.C.2d at 1064, 1067.

In sum, in *Computer III*, the FCC adopted general standards for ONA which the BOCs needed to satisfy as a precondition for lifting structural separation and which, when met, would eliminate the need for CEI plans. The FCC set February 1, 1988 as the date for demonstrating compliance with those standards through the filing of ONA plans.

The plans actually submitted pursuant to *Computer III*, however, did not meet those standards. The FCC recognized in the orders that the technology it thought in *Computer III* would soon permit open access and serve as a prerequisite to structural separation was not available; yet it approved the plans. This was a change in policy.

For example, in the *ONA Reconsideration Order*, the FCC acknowledged in paragraph 16 that the technology permitting fundamental unbundling had not been achieved:

16. It would be unwise to direct, as the ONA Users Group suggests, the implementation of a particular network technology at this stage. We agree with NYNEX that at this early point in ONA implementation we should not make the development of ONA dependent on particular technologies. We regard fundamental unbundling as a more long-term question, and have asked for the input of the IILC on the potential technical and operational difficulties involved.

*ONA Reconsideration Order*, 5 F.C.C.R. at 3086.

In paragraph 17 of the same order, the FCC elaborated on its view of "evolutionary" ONA and stated that fundamental unbundling was *not* a prerequisite to structural separation.

17. Given our evolutionary view of ONA and the continuing obligations of the BOCs, we do not believe that fundamental unbundling on the order of mandatory interconnection or "modularized" technology must precede the lifting of structural separation. The BOC ONA plan amendments demonstrate "fairly widespread deployment of a large number of ONA services over a broad cross-section of communities." As noted in the BOC ONA *Amendment Order*, we will, as appropriate, order the deployment of new ONA services and require further amendments to the ONA plans. Further unbundling remains an important long-term objective of ONA. On the road, however, toward achieving this long-range objective, prudence requires that we permit the BOC network operations to digest ONA-inspired changes and the ESPs' market response before considering any action to order more dramatic unbundling. (footnotes omitted).

*Id.*

In its *BOC ONA Amendments Order*, the FCC acknowledged that technology was not yet as advanced as it had anticipated in *Computer III*:

110. We agree that the amended plans contain limited information on how future technologies ... will be made available to ESPs. Some parties assert that the BOCs have deliberately withheld important information about their plans regarding these technologies. It appears, however, that the dearth of information filed last year is due largely to the fact that specific plans for these technologies had yet to be made.... Thus, while we share the disappointment of those who had hoped that advanced technologies could be developed and implemented more quickly, we recognize that substantial planning and analysis is necessary before deployment decisions can be made. (footnotes omitted).

*BOC ONA Amendments Order*, 5 F.C.C.R. at 3116.

The positions set forth in these orders do constitute a policy change from *Computer III*.

MCI, for its part, however, stretches too far in arguing that the change in policy requires us to invalidate the orders on the ground that the change in policy was insufficiently explained. FCC explained the change was necessary because existing technology was insufficient to implement complete ONA. Thus, although the FCC substantially approved the plans' implementation, it did not approve the ONA technology embodied in these plans as sufficient to constitute the prerequisite to the fundamental unbundling of services as described in *Computer III*. At the time of these orders, the BOCs were still required to file CEI plans for each enhanced service and to comply with other reporting requirements intended to prevent discrimination by the BOCs.

MCI's most telling point is that the orders before us represent a change from the FCC's earlier view in *Computer III* that complete ONA would precede lifting structural separation. These orders advance the view that structural separation can be lifted before the implementation of a fully realized ONA. However, the orders do not themselves lift structural separation and therefore need not fully explain the conditions under which separation can be lifted.

We are aware that the FCC has since ordered the lifting of structural separation. That order is not now before us. Whether that order represents a change in policy from *Computer III*, or from the orders before us in this proceeding, and whether any such change is adequately explained and justified, or whether that order is arbitrary, capricious or otherwise contrary to law in any respect, are all issues that cannot be determined until the FCC's order lifting structural separation is reviewed. The orders before us now do not in and of themselves violate any controlling principle of law.

## II. *California Petitioners' Claims*

Background

In *Computer III* the FCC set forth the general criteria for the offering of BSEs:

we require participating carriers to make available the initial set of Basic Service Elements based on the expected market demand for such elements, their utility as perceived by enhanced service competitors, and the technical and costing feasibility of such unbundling.

*Computer III*, 104 F.C.C.2d at 1065–66. The FCC required the BOCs to file ONA plans setting forth their initial lists of BSEs and stated that the BSEs "are to be tariffed in the appropriate federal or state jurisdiction." *Id.* at 1127–28.

In the *BOC ONA Order* conditionally approving the first set of submitted plans, the FCC determined that ONA services should be available in interstate tariffs. *BOC ONA Order*, 4 F.C.C.R. at 116. Accordingly, it decided to "treat [interstate] access arrangements as BSAs for federal tariffing purposes and require the BOCs to offer all of their BSEs that are *technically compatible* with such access arrangements in the federal access tariffs." *Id.* (emphasis added). The FCC defined the scope of interstate BSEs as follows:

We require the BOCs to provide BSEs within our interstate access tariff framework. We conclude here that such unbundled BSEs should include all basic services that satisfy our three "BSE selection" criteria regardless of whether the BOCs now

classify such services as BSEs or CNSs. We refer to such services as interstate BSEs.

*Id.* at 176–77. The FCC outlined the scope of the federal tariffing requirement:

Thus, if an ESP takes an interstate access arrangement ... for access to a BOC's network, any interstate BSEs that are technically compatible with that access arrangement must be unbundled in its federal tariff.

*Id.* at 48–49.

California petitioners sought reconsideration of the *BOC ONA Order,* challenging the federal tariffing of all BSEs that are technically compatible with interstate access services. Petition for Reconsideration, filed by Pacific Bell and Nevada Bell, CC Docket 88–2, Phase I, (Feb. 23, 1989). Petitioners argued that because BSEs are not in fact utilized interstate but are intrastate features and functions, the FCC lacked authority to regulate them. *Id.* at 3–4. In the *ONA Reconsideration Order,* the FCC reaffirmed its determination to require the BOCs to offer all BSEs that are technically compatible with interstate access arrangements in their federal tariffs. *ONA Reconsideration Order,* 5 F.C.C.R. at 3088. The FCC explained that BSEs are associated with BSAs and BSAs are offered in both state and federal tariffs. *Id.* at 3089. In the *ONA Reconsideration Order,* the FCC also tentatively prohibited "mixing and matching" of state and federal BSAs and BSEs. *Id.* This prohibition requires those ESPs who choose state-tariffed BSAs to use state-tariffed BSEs as well. Following this court's decision in *California I,* the FCC in the *ONA Remand Order,* reaffirmed its ONA policies and adhered to the federal tariffing requirement for interstate BSEs. *ONA Remand Order,* 5 F.C.C.R. at 7719.

The Communications Act of 1934, 47 U.S.C. §§ 151–613, (Act) establishes a system of dual state and federal regulation of telecommunications. The Act delineates a strict separation between interstate and intrastate jurisdiction. The Act grants the FCC authority to regulate "interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service." 47 U.S.C. § 151. The Act, however, denies the FCC authority over intrastate communications. Specifically, section 2(b)(1) provides in pertinent part:

[N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier....

47 U.S.C. § 152(b)(1).

The Supreme Court has concluded that "this provision fences off from FCC reach or regulation intrastate matters—indeed, including matters 'in connection with' intrastate service." *Louisiana Public Serv. Comm'n v. FCC,* 476 U.S. 355, 370, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986). In *Louisiana,* the Court, dealing with FCC preemption of state regulation, rejected the argument that section 2(b)(1) applies only when interstate communication is not affected, finding that because section 2(b)(1) is a specific denial of agency authority to act, the FCC cannot act at all, let alone preempt state action, in connection with intrastate communication. *Id.* at 373–74, 106 S.Ct. at 1901.

■ To determine whether the FCC has jurisdiction to regulate a particular telecommunications service, courts must focus on the nature of the service at issue. *See, e.g., Illinois Bell Tel. Co. v. FCC,* 883 F.2d 104, 112–13 (D.C.Cir.1989); *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 746 F.2d 1492, 1498 (D.C.Cir.1984) (*NARUC*). Services may be regulated by the FCC only to the extent of their interstate use. *NARUC,* 746 F.2d at 1498. "The dividing line between the regulatory jurisdictions of the FCC and states depends on 'the nature of the communications which pass through the facilities [and not on] the physical location of the lines.'" *Id.* (quotation omitted). Section 2(b)(1), which reserves to the states the sole authority to regulate intrastate telecommunications services, applies to the provision of

enhanced services as well. *California I*, 905 F.2d at 1239–40. Thus, this court has recognized that "enhanced services may be offered on a purely intrastate basis." *Id.* at 1244.

In *California I*, this court concluded that FCC preemption of state regulation of the sale of enhanced services violated section 2(b)(1), finding that telecommunications services, including enhanced services, that are "delivered on an intrastate basis by telephone carriers over the telephone lines ... qualify as services 'in connection with intrastate communication service by wire ...' of any carrier.'" *Id.* at 1240 (quoting 47 U.S.C. § 152(b)(1)).

Here, the FCC has required that all BSEs that are technically compatible with BSAs be offered in federal tariffs. The FCC is setting a rate, but not mandating its use, for all BSEs that potentially can be used for interstate service. California contends that the FCC lacks jurisdiction to regulate based on technical compatibility because this standard is too broad, and the FCC must define BSEs based on their jurisdictional use and regulate only those BSEs which are actually used for interstate communications services.

California relies on this court's decision in *McDonnell Douglas Corp. v. General Tel. Co.*, 594 F.2d 720 (9th Cir.), *cert. denied*, 444 U.S. 839, 100 S.Ct. 77, 62 L.Ed.2d 50 (1979), for the proposition that an intrastate service is not rendered interstate merely because it is technically compatible with interstate use. *McDonnell Douglas*, however, did not involve the question of the FCC's authority to set rates. Rather, it was an action between two private parties in which McDonnell Douglas claimed that a telephone company had charged discriminatory rates for Centrex service in violation of section 202 of the Communications Act. This court concluded that McDonnell Douglas failed to state a claim under the Act because Centrex was used solely for intrastate service and section 152 excluded intrastate service from the coverage of the Act. The court's conclusion that section 152 of the Act excluded coverage was based on the nature of the service that General Telephone had already provided to McDonnell Douglas, and it was clear that this service was solely intrastate. Here, by contrast, FCC seeks to offer federal tariffs for services which potentially will be used for interstate service. Thus, our decision in *McDonnell Douglas* is not controlling regarding the question of whether FCC has the jurisdictional authority to regulate BSEs which are compatible with interstate service.

Unlike the question we addressed in *California I*, the FCC is not attempting to preempt the states from regulating intrastate services. The ONA orders clearly establish a dual federal and state tariffing structure for BSEs, and the states will retain authority to set rates for those BSEs which are used for intrastate service. This system complies with the Supreme Court's decision in *Louisiana* that the Communications Act is designed to establish a dual regulatory scheme. Essentially, the state is seeking to preempt FCC regulation of communications, and this violates the Act just as FCC preemption of state regulation did in *Louisiana* and *California I*.

The states' primary objection to federal tariffing of BSEs appears to be the fear of tariff shopping. Because states often subsidize the provision of local telephone service by charging higher rates for enhanced services, the state tariff rates for BSEs will generally be higher than the federal tariff rates. The states are concerned that ESPs will purchase BSEs from the federal tariff even when those BSEs are used for intrastate service and that the states will lose money. Although we recognize the states' concern, it does not deprive the FCC of authority to require federal tariffing of BSEs. This is primarily an enforcement problem and the FCC is entitled to adopt a wait and see approach regarding such problems. *See National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1208 (D.C.Cir.1984); *Telocator Network v. FCC*, 691 F.2d 525, 550 & n. 191 (D.C.Cir.1982). Further, the FCC already has addressed this problem by prohibiting mixing and matching. This means when an ESP takes an intrastate BSA, the ESP must also take intrastate BSEs. California has not established that FCC is so unresponsive to the states' concerns that the tariff must be invalidated.

**1516**

The overall purpose of ONA is to provide a regulatory structure that will meet the needs of the rapidly changing enhanced services industry. The best way to facilitate this is to require unbundling to the fullest extent technologically possible and to make unbundled services available to ESPs on as broad a basis as possible. We hold that the federal tariffing of BSEs that are technically compatible with interstate service meets these overall goals and is within the FCC's jurisdictional authority.

## CONCLUSION

The petitions for review by MCI and California are DENIED.